Melinda Starr HICKS, Respondent,

v.

Michael Leon HICKS, Appellant.

No. WD 54257.

Missouri Court of Appeals,
Western District.

June 2, 1998.

---

Carla G. Holste, Carson & Coil, P.C., Jefferson City, for appellant.

Kerry G. Rowden, Tuscumbia, for respondent.

Before BRECKENRIDGE, P.J., and LOWENSTEIN and SPINDEN, JJ.

BRECKENRIDGE, Presiding Judge.

Michael Leon Hicks (Father) appeals the trial court's judgment dissolving his marriage to Melinda Starr Hicks (Mother). He contends that the trial court erred by awarding Mother primary custody of the parties' three children. He also claims that the child support award was not supported by the record because the trial court failed to make a finding that the Form 14 he submitted was unjust and failed to enter its own calculation on the record, and that the trial court erred in ordering Father to pay one-half of Mother's student loan and one-half of Mother's Jeep debt. Because the trial court did not make findings required by Rule 88.01 regarding its child support award, that portion of the judgment is reversed and remanded. The child custody award is affirmed, as there is substantial evidence to support the trial court's finding that it is in the best interests of the children that Mother be the children's primary custodian. This court also affirms the trial court's allocation of the student loan and the Jeep debt because the property and debt division is fair and equitable and both debts were incurred during the marriage.

■ On appeal of a judgment in a dissolution of marriage proceeding, this court reviews the evidence in the light most favorable to the trial court's decision. *Replogle v. Replogle*, 903 S.W.2d 551, 553 (Mo.App.1995). Father and Mother were married on February 16, 1990. They have three children, Michael Elza Hicks, who was born on October 10, 1990, Tyler Jordan Hicks, who was born on November 19, 1991, and Ashlee Nicole Hicks, who was born on January 14, 1994. At the time of separation, the family was living in Blue Springs, Missouri. The family moved from Columbia, Missouri to Blue Springs in June of 1995. Mother had been working at a Wal–Mart store in Columbia, and was transferred to the Blue Springs Wal–Mart store. Father was employed as a police officer for the City of Independence Police Department.

Approximately five months after moving to Blue Springs, Mother was transferred to an assistant manager position at a Wal–Mart store in Overland Park, Kansas. At the Overland Park Wal–Mart, Mother worked five to six days a week. Two of those days she worked from 7:00 a.m. until 12:00 a.m. or 1:00 a.m., and the remaining days she worked from 7:00 a.m. until 5:00 p.m. Father worked four days a week from 4:00 p.m. to 2:00 a.m.

After Mother's cousin's child drowned in an accident, Mother wanted to spend more time with the children, and asked to be transferred back to the Blue Springs Wal–Mart store in October of 1996. Father was opposed to this. He testified that her transfer put the family in a financial bind and was one of the causes of the break-up of their marriage. Mother's salary at the Blue Springs Wal–Mart was about half of what it was at the Overland Park Wal–Mart.

Father and Mother separated on November 14, 1996, when Mother and the children left the marital residence and moved to Eldon to live with the children's maternal grandmother and step-grandfather. The next day, Mother filed her petition for dissolution of marriage and, thereafter, Father filed a counter-petition for dissolution of marriage.

The case was tried on January 30, 1997. On April 8, 1997, the court entered a judgment dissolving the parties' marriage and ordering the division of property and debts. The court also ordered that the parties have joint legal custody of the three children, and awarded Mother primary physical custody. Father was granted reasonable visitation rights, including every other weekend, every other holiday, and the full month of July. Additionally, Father was ordered to pay $825 per month in child support. Father timely filed this appeal.

### Sufficient Evidence Supports the Child Custody Award

In his first point, Father contends that the trial court erred in awarding primary physi-

cal custody of the parties' three children to Mother. He argues that the evidence does not support such award because he was the children's primary caregiver, Mother abruptly removed the children from the family home, he can provide the children with a more stable environment than Mother can, and his proposed joint custody plan afforded both parents more frequent and meaningful contact with the children.

 This court will affirm the custody determination of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence or the trial court erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Flathers v. Flathers*, 948 S.W.2d 463, 465 (Mo.App.1997). The appellate court affords the trial court greater discretion in determining child custody than in other matters. *Flieg v. Flieg*, 884 S.W.2d 347, 348 (Mo.App.1994). " '[B]ecause of the trial court's unique position for determining the credibility, sincerity, character, and other intangibles of the witnesses, we presume awards of custody are made in the best interests of the children.' " *Flathers*, 948 S.W.2d at 471 (quoting *Gismegian v. Gismegian*, 849 S.W.2d 201, 202 (Mo.App.1993)). This court will not disturb the trial court's determination of custody unless it is manifestly erroneous and the welfare of the children demands a different result. *In re Marriage of Douglas*, 870 S.W.2d 466, 469 (Mo.App.1994).

 Section 452.375.2, RSMo Cum.Supp. 1997, lists eight factors for the trial court to consider in determining custody in accordance with the best interests of the children. These eight factors are:

(1) The wishes of the child's parents as to his custody;

(2) The wishes of a child as to his custodian;

(3) The interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to his home, school, and community;

(5) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm;

(6) The needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(7) The intention of either parent to relocate his residence outside the state; and

(8) Which parent is more likely to allow the child frequent and meaningful contact with the other parent.

Father contends that the trial court did not consider the third, fourth, sixth, and eighth factors in awarding primary physical custody of the children to Mother. However, where the trial court was not requested to and did not make specific findings regarding these factors, this court is "entitled to presume that the trial court considered all the evidence and made its award in the best interests of the child." *Flathers*, 948 S.W.2d at 471.

 Father asserts that he was the primary caregiver for the children prior to the separation. He testified that after the family moved to Blue Springs, he took care of the children in the mornings. He also offered the testimony of an employee of the children's daycare center who testified that Father picked up and delivered the children to and from daycare 85% of the time. Father points out that Mother even testified that Father was the primary caregiver for the children 50% of the time.

That Father was an equal participant in raising the children does not establish that the trial court erred in awarding primary physical custody to Mother. Moreover, the fact that Father cared for the children in the mornings and took the children to and from

daycare was more a matter of necessity than choice, and was only for the period when Mother worked at the Overland Park Wal-Mart store. For that job, Mother had to leave for work at 6:15 a.m., and worked until at least 5:00 p.m., and sometimes until 12:00 a.m. or 1:00 a.m. In contrast, Father did not have to be at work until 4:00 p.m.

Even though Father did not have to be at work until 4:00 p.m., he took the two younger children to daycare between 9:15 and 9:30 a.m., after their oldest child left for kindergarten. When Mother transferred back to the Blue Springs Wal-Mart, she and Father set up a system in which Father would watch the children during the day before he went to work. Father disagreed with this arrangement. He testified that the youngest child, Ashlee, enjoyed going to daycare and the persons at the daycare center enjoyed having her there, and it was easier to keep the children in daycare full time rather than to try to find a baby-sitter in an emergency. Additionally, Father believed that the children needed to be taught basic skills and could learn more at daycare than they could staying home with him, even though he has a teaching degree and was employed as a teacher before becoming a police officer. After a week of having the two younger children at home with him during the day, Father decided to put the middle child, Tyler, back in daycare to develop his social skills with females. This evidence does not support Father's assertion that he was the children's primary caregiver.

Father also argues that he should be awarded primary physical custody of the children because Mother abruptly removed them from their home and school in Blue Springs by moving them to Eldon. His argument that Mother's move to Eldon warrants reversal of the custody award is not persuasive considering the family's history. During their six-year marriage, the parties moved five times. Only the oldest child, Michael, was in kindergarten at the time Mother moved to Eldon and had to change schools. Moreover, the evidence showed that the parties had discussed moving to Eldon several times during their marriage, and Father had expressed a desire that the children go to school in Eldon.

Father contends that Mother cannot provide the children with a stable environment in Eldon because at the time of trial, Mother did not have a permanent residence and was temporarily living with her mother and step-father, she did not have a permanent job, and she did not know what hours she would be working when she did find permanent employment. He claims that since he has a permanent job, knows his hours and income, and knows where the children would be living, he can provide the children with a more stable environment.

Mother testified that she was temporarily employed and was actively seeking permanent employment. She also testified that as soon as she found permanent employment, she and the children would be moving to a permanent residence. Temporarily, she and the children were living with her mother and step-father, who had cared for the children an average of six days per month during the two years prior to the parties' separation. Furthermore, several members of Mother's extended family live in Eldon and are available to help baby-sit the children if necessary, and Father's family lives nearby in Jefferson City. Although Mother's employment situation and living arrangement are temporary, the evidence does not support Father's contention that the children's home environment with Mother is unstable.

Father next argues that the trial court erred in awarding Mother primary physical custody because his proposed custody plan allowed Mother more frequent contact with the children than Mother's proposed plan allowed Father; therefore, he was the parent who would be more likely to allow frequent and meaningful contact with the other parent under factor eight of § 452.375.2, RSMo Cum.Supp.1997. Mother testified that if she was awarded custody, she would have no problem with Father having visitation with the children every day he was not working. Because at the time of trial Father worked every Thursday, Friday, Saturday, and Sunday, and the days he was off work would be the days that the children would be in school, Father contends there would be no effective

way for him to exercise visitation under Mother's proposed plan. Father points out that under his proposed custody plan, he would have primary physical custody, and Mother would have alternate weekends with the children. Since Mother does not work on the weekends, Father insists that both parties would have substantial time with the children under his plan.

■ The problem with Father's argument is that given his work schedule and the children's school schedule, the only way Mother could have allowed him more time would be to give him primary physical custody of the children so that he could have the children during the week when he is not working. The fact that Mother's work schedule may be more conducive to weekend visitation than his work schedule does not mean that he is the parent more likely to allow frequent and meaningful contact between the children and the other parent. The trial court believed that the best interests of the children would be served by awarding primary physical custody to Mother, and since the date of separation, Mother has allowed Father frequent visitation with the children. Father testified that he had seen the children every week since the separation and every time that he had requested visitation from Mother. He also testified that although Mother had denied him some overnight visitation, she had not denied him visitation in general. In fact, Father's deposition testimony indicates that the reason for his not having had more overnight visitation was because the oldest child, Michael, was in school. The evidence does not support Father's contention that Mother would not allow him frequent and meaningful contact with the children.

Father also claims that the trial court failed to allow him frequent and meaningful contact with the children by not adopting his custody and visitation proposal, and by instead giving Mother primary physical custody and awarding Father visitation every other weekend, every other holiday, and one month during the summer. He complains that because he now works from 7:00 a.m. until 5:00 p.m. on the weekends, and Mother and the children reside two and one-half hours away, his visitation with the children will be extremely limited.

Father's actual time spent with the children on the weekends will be shorter because of his work schedule. However, this alone does not make the trial court's award of primary physical custody of the children to Mother manifestly erroneous, nor does it make the trial court's visitation award against the best interests of the children. Although Father alternatively requests that this court modify the trial court's visitation schedule to allow him more time with the children during the summer and holidays to make up for his weekend visitation, this court does not find that the trial court abused its discretion in giving him the full month of July in the summer and every other holiday. Father's first point is denied.

### The Trial Court Failed to Make the Proper Findings Regarding Child Support

■ In his second point, Father contends that the trial court's child support award of $825 per month was not supported by the record. The only Form 14 offered and received into evidence was Father's, and his Form 14 calculated a presumed child support amount of $578 per month. Father argues that the trial court did not find that his figure was unjust or inappropriate and did not enter its own calculation on the record. With regard to child support, the trial court in its findings stated only "[t]hat the minor children requires (sic) support in the amount of Eight Hundred Twenty–Five Dollars Per Month," and it ordered Father to pay Mother "Two Hundred Seventy Five Dollars per month per child, in the sum of Eight Hundred Twenty–Five Dollars per month...."

In *Woolridge v. Woolridge*, 915 S.W.2d 372 (Mo.App.1996), this court considered the interplay of Rule 88.01 and Civil Procedure Form Number 14, and provided trial courts with detailed instructions on making child support findings. In holding that the trial court's determination of the correct Form 14 amount must be apparent from the record, this court noted that meaningful appellate review is impossible absent a complete record. *Id.* at 380. Furthermore, this court

held that unless the trial court adopts a proposed Form 14 of one of the parties or completes one itself, there is no way for the appellate court to ensure that the trial court undertook the appropriate and necessary analysis under Rule 88.01. *Id.* at 381–82. This court reversed and remanded the trial court's order because the court did not accept either of the parties' proposed Form 14s, complete its own Form 14 worksheet, or at least indicate on the record how the trial court calculated the presumed child support amount under Form 14. *Id.* at 382–83. The reasoning in *Woolridge* was approved by the Missouri Supreme Court in *Neal v. Neal*, 941 S.W.2d 501, 504 (Mo. banc 1997).

Here, as in *Woolridge* and *Neal*, the trial court's calculation of the presumed correct child support amount is not apparent from the record. Meaningful appellate review is impossible; therefore, a reversal is required on the issue of child support. *Neal*, 941 S.W.2d at 504. On remand, the trial court should consider *Woolridge* and abide by its instructions in determining and finding for the record the presumed child support amount under Form 14. *Neal*, 941 S.W.2d at 504. Then, if the trial court determines that the presumed amount is inappropriate, it should follow *Woolridge* in making a proper record of the reason the amount is rebutted. *Neal*, 941 S.W.2d at 504. On remand, the amount of support shall be ordered to be paid in the aggregate and not "per child," as *per capita* orders are contrary to the mandate of Rule 88.01 and Form 14. *McCreary v. McCreary*, 954 S.W.2d 433, 437 n. 1 (Mo. App.1997).

### The Trial Court Did Not Err in its Allocation of Marital Debt

In his final two points, Father claims that the trial court erred in ordering him to pay one-half of Mother's student loan and one-half of the unknown balance owed due to the repossession of a Jeep Mother purchased. In the trial court's property division, Mother was awarded $825 in marital property and ordered to pay $22,004 plus half of the Jeep debt, while Father received $2,835 in marital property and was ordered to pay $23,242 plus half of the Jeep debt. Father argues that he should not have to pay for half of the student loan and the Jeep debt because he did not co-sign the loans with Mother. He also argues that he should not have to pay the student loan debt because at the time that debt was incurred, he made several sacrifices to allow her to attain her college degree, including voluntarily quitting his head coaching position and withdrawing $15,000 from his teacher's retirement fund to help pay the bills while Mother was attending college. Father contends that he should not have to pay one-half of the debt on the Jeep because he did not co-sign the loan with Mother, he disagreed with her purchasing the Jeep, and her "voluntary reduction of her income" by transferring from the Overland Park Wal–Mart to the Blue Springs Wal–Mart caused her inability to pay the Jeep debt herself.

Because "marital property" is defined by § 452.330.2, RSMo Cum.Supp.1997, as "all property acquired by either spouse subsequent to the marriage," it follows that "marital debt" is " 'ordinarily debt incurred subsequent to the marriage.' " *In re Marriage of Welch*, 795 S.W.2d 640, 643 (Mo.App. 1990). The trial court has no duty to distribute marital debts. *Vehlewald v. Vehlewald*, 853 S.W.2d 944, 950 (Mo.App.1993). However, the trial court is obligated to consider marital debts in determining a fair division of marital property. *Schneider v. Schneider*, 824 S.W.2d 942, 948 (Mo.App.1992). The trial court has "broad discretion in determining how and in what manner the property and debts should be divided," and this court will not disturb the division absent a clear showing of abuse of discretion. *Tucker v. Tucker*, 778 S.W.2d 309, 312 (Mo.App.1989).

The property and debt division in this case is just and equitable. Both of the debts about which Father complains were incurred during the marriage and used to benefit the marriage. The funds from Mother's student loan debt were used not only to pay for part of Mother's college costs, but to buy groceries, pay bills, and cover the cost of the children's daycare during the last two

years Mother was in school.[1] Likewise, the Jeep was purchased during the marriage and used as the family vehicle because the family had outgrown their previous car. The fact that Father did not participate in borrowing the money or in the promise to repay it does not preclude allocation of part of the debt to him where the debt is determined to be a marital debt. *Welch*, 795 S.W.2d at 645. The trial court did not abuse its discretion in its division of property and allocation of marital debt, including ordering Father to pay one-half of Mother's student loan debt and one-half of the Jeep debt. Father's third and fourth points are denied.

Because the trial court did not make the proper findings regarding the child support amount pursuant to *Woolridge*, the child support award is reversed and remanded for proceedings consistent with this opinion. The judgment is affirmed in all other respects.

All concur.

1. The withdrawal from Father's retirement fund was used to pay the family's living expenses during the first year Mother attended school full time.