**In re the Marriage of Ruth L. DEVORE (now Willoughby), Appellant,**

v.

**Jon P. DEVORE, Respondent.**

No. 23365.

Missouri Court of Appeals, Southern District, Division One.

Oct. 30, 2001.

Motion for Rehearing or Transfer Denied Dec. 3, 2001.

Application for Transfer Denied Jan. 22, 2002.

William J. Fleischaker, Roberts, Fleischaker, Williams, Wilson & Powell, Joplin, for Appellant.

Russell A. Ward, Joplin, for Respondent.

C. DAVID DARNOLD, Special Judge.

Ruth L. Devore, ("mother"), appeals the trial court's judgment refusing to allow her to relocate the primary residence of the parties' child from Carl Junction, Missouri, to Lawton, Oklahoma. Her former husband, Jon P. Devore, ("father"), filed an objection to mother's proposed relocation. Mother contends the trial court's decision was against the weight of the evidence, was unsupported by substantial evidence, and erroneously declared and/or applied the law. We review on the basis of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

The Circuit Court of Jasper County, Missouri, issued a Decree dissolving the marriage of mother and father on September 8, 1994. Custody of the parties' one minor child, Jake P. Devore, ("Jake"), born January 18, 1992, was awarded jointly to mother and father. Primary physical custody was placed with mother. Father was granted visitation to consist of weekday visitation, time agreed upon by the parties, alternating weekends and alternating major holidays pursuant to the parties' plan of joint custody and visitation which the trial court approved.

The judgment also contained a provision that neither party shall leave the State of Missouri to reside in another jurisdiction for a period in excess of ninety days without first obtaining written consent from the other or prior approval of the Circuit Court of Jasper County, Missouri, at Carthage.

From the time of the dissolution until November 1996, father's normal schedule of visitation was overnight Tuesday and Thursday evenings from 3:30 p.m. until Jake was delivered to a daycare facility the next morning, and overnight Fridays from 3:30 p.m. until noon on Saturday. In November 1996, mother terminated father's overnight mid-week visitations leading father to file a motion to make specific his rights of visitation.

On March 7, 1997, the Circuit Court of Jasper County, Missouri, entered a Judgment Order of Modification based upon the stipulation of the parties. At that time, the visitation was modified to provide that father would have reasonable visitation at all times agreed upon by the parties, and father would have alternate weekend visitation and mid-week visitation consisting of Tuesday and Thursday evenings from after school until 8:30 p.m. on the week of his regularly scheduled weekend visitation, and on Tuesday evening from after school until 8:30 p.m. on alternate weeks.

The judgment further set out alternating holiday vacation and provided that each parent shall have one uninterrupted week of visitation during the months of June, July and August. The Judgment also modified the child support obligation from $400 monthly to $381 monthly. However, subsequent to the modification judgment, the parties began to have conflict over the amount of father's visitation.

The record shows that in November 1994 mother married Herb Willoughby. In November 1997 father also remarried and moved to Carl Junction where mother and her new husband had relocated in 1995. Mother gave birth to a new son, Blake, on July 14, 1997. Father and his new wife's son, from her former marriage; Mr. Willoughby's son from a former marriage; and Jake were all about the same age and attended the same daycare in Carl Junction.

Mother's new husband was a division manager with Consumer Markets ("Consumers"), having been employed there for approximately 28 years. In May of 1997, Mr. Willoughby became aware that Consumers was having financial difficulty. Mr. Willoughby had two years of education through Missouri Southern State College and most of his training was on the job. He testified his expertise was in the field of grocery store management and that he had held management positions since 1978. Mr. Willoughby had seen a change in the industry in that large companies were "squeezing" out the smaller ones. Consumers at one point had 40 grocery stores. It was downsizing 20 stores. Earlier in 1997, Mr. Willoughby had been contacted by an individual to come work for him, but Mr. Willoughby declined that offer. Realizing Consumer's unstable financial condition, however, Mr. Willoughby then expressed an interest in working for this individual's company. Mr. Willoughby sent resumes to other companies, but had received no other job offers in the 1997 time frame.

In July 1998, Mr. Willoughby accepted a position with Carter Investments. He was offered the position of Vice President of Operations. At that time Carter Invest-

ments owned three grocery stores in Southeast Kansas and three stores in Lawton, Oklahoma. Mr. Willoughby believed he would be overseeing the stores in Southeast Kansas. He would also travel to Lawton, Oklahoma to oversee those three stores. At that time, a grocery store manager earned between $35,000 $45,000 annually. As District Manager with Consumers, Mr. Willoughby was paid $55,000 annually and was provided a company car. His wife was working for March of Dimes making approximately $20,000 per year.[1] Mr. Willoughby's new position with Carter Investments provided him an income of $65,000 per year and included an ownership interest in the company. At trial, Mr. Willoughby stated he could not have found another position in Southwest Missouri or Southeast Kansas paying the kind of salary he was making with Carter Investments. He testified that he could have taken a store management position but that would have meant a substantial reduction in pay.

Mr. Willoughby further related that he had been contacted on several occasions by Wal–Mart to work for that concern. He stated that Wal–Mart paid upper management very well. However, because of his personal animosity towards Wal–Mart—having heard that Wal–Mart managers have no personal life because of the job demands—he related that he would not consider working for Wal Mart. He did state that when he first started working for Carter Investments he believed he would be able to stay in the Joplin area to supervise the Kansas stores. However, it didn't turn out that way. He testified that by the fall of 1998, he had to relocate to Lawton, Oklahoma and he did not feel that his skills would be transferred to other

1. Mother testified that she had planned to work until 1999 to reduce family debts to a point where the family could live without her income. Prior to Mr. Willoughby obtaining his present position, she was unable to quit work.

businesses because he had been in the grocery business since age 16.

Mr. Willoughby further testified that when Consumers went out of business, he felt that employment with Carter Investments was the only option he had. Mr. Willoughby stated that he did not seek management positions in other fields, such as department stores or supply companies or any other type of retail management, and that he only looked for management within the grocery industry. He testified that he did not consider quitting Carter Investments and looking for work in the Joplin area prior to discovering in the fall of 1998 that the family would have to relocate.

Mr. Willoughby put the house up for sale in Carl Junction in early 1998 because they wanted to sell and build another home. Since Mr. Willoughby had relocated to Lawton, Oklahoma, he testified that it was no longer feasible for mother and children to continue to reside in the Joplin area and maintain different residences. The Willoughby's had a contract to sell their home in July 1999 at which time they invited father and his wife to their home to discuss plans for moving to Oklahoma. At the time, father told them he would not consent to the move and that he would do what he could to keep Jake in the Joplin area.

Mother verbally notified father in July 1998 that her husband had taken new employment and that they might have to move but that they were hoping they would not move. In September or October 1998, mother told father it looked like they would have to move and that they would be doing so once their house was sold. At that time, father never expressed his view about the move one way or the other. Mother assumed he would be agreeable. Father ultimately disapproved of the proposed move.

On July 16, 1999, mother, through counsel, sent a letter to father pursuant to section 452.377 notifying father that she intended to relocate Jake's residence on August 1, 1999, prior to the expiration of the sixty day notice.[2] Mother's letter stated she would comply with the terms of the joint custody plan during the sixty day notice period and that she would not be providing father with his mid-week visitation, and would require father to travel to Stroud, Oklahoma to pick up the child for weekend visitations, contrary to the provisions of the joint custody plan. Additionally, mother proposed modifying the scheduled visitation to provide father with: (1) reasonable visitation any time father was in Lawton, Oklahoma area; (2) six weeks of continuous visitation through the summer, during which time mother would have alternate weekend visitation to take place in Jasper or Newton County, Missouri; (3) a week of visitation between Christmas and New Years; and (4) one week of visitation during Spring break. Under mother's proposal, the Parties would continue to alternate visitation on Thanksgiving, Memorial Day and Labor Day as under the then present joint custody plan. The proposal also included the provision that in lieu of regular weekday and weekend visitations that father was to have visitation for at least three days on weeks concluding with a three-day weekend, in accordance with the school calendar in Lawton, Oklahoma. Mother suggested exchanging the child for visitation at either Stroud, Oklahoma or Bristow, Oklahoma.[3]

---

**2.** All statutory references are to RSMo Cum. Supp.1998.

**3.** "The distance between Carl Junction and Lawton[,] Oklahoma is approximately 300 miles, it is about a 4½ hour drive and Stroud

Mother moved to Lawton, Oklahoma at the end of July 1999, where Jake was enrolled in the Lawton schools.

On August 12, 1999, father filed a motion seeking an order prohibiting the relocation of the minor child. In his motion he attached an affidavit alleging the move would not be in the best interest of the child.

Mother admitted that she and her husband had never explored the possibilities of remaining in the Joplin area and trying to find employment in order to maintain their family income. As previously set out, she had been earning $20,000 per year until 60 days prior to the move and had never been a full-time mother. She also stated that once the house was sold, she never considered staying in the Joplin area pending a court ruling. Mother further stated that if she stayed in the Joplin area and the court later approved the move, she would have to change schools mid-semester.

Jake was in the second grade at the time of the hearing. Mother described him as an artistic child who was more intellectual than athletic. She stated he had made friends in Lawton, Oklahoma during the time they had been staying there and she felt that Jake was as well-adjusted in school in Lawton, as he had been in Carl Junction. She stated that during the period of time she was working at Carl Junction she had enrolled her younger son, Blake, at the daycare center in Carl Junction and that Jake's father and his wife also brought their young son to the same daycare center. Jake came to the daycare center after school, but there was not a lot of interaction between the two younger brothers and Jake at daycare. She stated that if she was not permitted to relocate to Lawton this would have a nega-

tive effect on Jake. She said she would have to go back to work and would be unable to spend as much time together as a family unit, and Jake would have to return to daycare. She stated that if she relocated to Lawton, father's weekday visitation would no longer be feasible because of the distance of travel.

Mother acknowledged that father has always been an active participant in Jake's life. He exercised the visitation periods he was entitled to, he attended every church, school, and athletic function the child had, and he always maintained his support payments. She stated that because of the move to Lawton, Jake would spend less time with extended relatives. Mother also stated that she intended to move the child whether or not the child or father agreed. She maintained that her proposed visitation schedule would provide an equal amount of visitation, just not as frequently. She never considered offering father more visitation after her move in order to compensate for the decreased frequency of visitation by father.

Mrs. Devore testified that she and father were married on January 6, 1996, and that they had a child together, Ryan, born July 27, 1997. She related that in 1998 she and father built a house in Carl Junction area so that they could be closer to Jake, because mother and her new husband had moved to Carl Junction.

Father acknowledged that when he was informed that Mr. Willoughby had taken a job in Lawton, Oklahoma, and that there might be a possibility mother would petition to move, they really didn't discuss it. Father also related that the trip to Stroud, Oklahoma cost about $24 per trip, in addition to a ¾ tank of gas to go down and back. He stated that when Jake was at daycare in Carl Junction he would see him

is mid-point [between Joplin, Missouri and Lawton, Oklahoma]."

almost daily because he usually picked up his younger son Ryan. If Jake moved to Lawton, Oklahoma father stated that he would not be able to see Jake engage in weekday activities at school and sports, and would not see him on a daily basis. Father felt it was very important to have daily contact with Jake as he believed it was important to any child's development for them to have daily contact with his or her father.

Father called as a witness Pam Shrewsbury, director of the daycare facility in Carl Junction where all the parties' children attended. Ms. Shrewsbury testified that there were some disputes between the parties over father taking Jake from daycare and about Ryan being enrolled in the facility. She stated that father was a concerned parent who shared a close relationship with Jake and she testified that father enjoyed more contact with Jake and was closer to him than what she normally observed between fathers and sons in other divorce situations.

Father acknowledged that he had a daughter born out of wedlock in 1995 and never visited the child, as that was what the mother of that child wanted. Father stated that he never filed a motion for visitation with that child or attempted to visit her, but that he did pay child support. Father also acknowledged that he had never told Jake about the sister born out of wedlock. Father further acknowledged that mother allowed him visitation above and beyond what the court awarded him. Father testified that after mother moved with her husband to Lawton on August 1, 1999, he no longer got his mid-week visitation and he was required to drive to Stroud, Oklahoma, to pick up the child, except for those occasions when mother was coming to Joplin and provided the transportation. Father expressed his belief that to allow the move was not in

Jake's best interest as it would effectively deprive him from being an active participant in his child's life.

On October 1, 1999, the court entered a docket entry which prevented the relocation of the minor child. This was followed by a formal judgment entry on October 20, 1999. The judgment also awarded father attorney fees of $3,000.

In its judgment which prevented the relocation of Jake, the trial court found that, based on the four factors announced in case law, "the move to Oklahoma was anticipatory and voluntary, with no evidence that the move would improve the quality of life for [mother and that the fact that mother could stay at home was of] limited benefit compared to the detriment to the child and his relationship with his father.... As to [mother's ] motives in moving, [father's] contentions cannot be ignored; there was no showing of an attempt to find comparable employment by [mother's] spouse in this area...."

The trial court also entered finding of facts and conclusions of law in the form of fifty-two questions and answers, in which it found that the relocation of the minor child was not in his best interest and that the mother failed to meet her burden of proof demonstrating that the relocation would improve the general quality of life for the parent and the minor child. The trial court also found that the integrity of mother's motives for relocating the minor child was "just short of brazen."

In this appeal, mother claims the trial court erred in denying her motion to relocate the minor child, pursuant to section 452.377, because the trial court's finding that the move was not in the best interest of the child was not supported by substantial evidence, was against the weight of the evidence, and erroneously declared and applied the law. Thus, this appeal requires this Court to determine whether

the decision of the trial court barring the relocation of Jake to Lawton, Oklahoma is supported by substantial evidence and correctly declares and applies the law.

Both parties, in their briefs and during oral arguments before this Court, stated that the case law required the trial court to apply four factors, as set out in *Michel v. Michel*, 834 S.W.2d 773, 776 (Mo.App. 1992), in order to determine the best interest of the child.

Since submission to this Court, the Supreme Court of Missouri handed down the case of *Stowe v. Spence*, 41 S.W.3d 468 (Mo. banc.2001), in which our high court, citing *Michel*, 834 S.W.2d at 777, stated: "*Michel*'s four-part test is inconsistent with the statutory requirements and shall not be used in determining the child's best interests." *Id.* at 469. The Supreme Court further set out that "[i]n lieu of this test, section 452.377 now requires the court to determine that the relocation: (1) is in the best interests of the child, (2) is made in good faith, and (3) if ordered, complies with the requirement of subsection 10." *Id.*

■ Subsection 9 of section 452.377 places the burden of proving that the proposed relocation is made in good faith and is in the best interest of the child on the party seeking relocation. In this case that burden was on mother.

■ "In matter's pertaining to custody rights, this court gives deference to the trial court's assessment of what serves the best interests of the child, and that judgment will not be disturbed on appeal unless the judgment is not supported by substantial evidence, it is against the weight if the evidence, or it erroneously declares or applies the law." *Thomas v. Thomas*, 989 S.W.2d 629, 633 (Mo.App. 1999). We afford the trial court greater discretion in determining child custody is-

sues than in other matters. *Hicks v. Hicks*, 969 S.W.2d 840, 843 (Mo.App.1998). "[B]ecause of the trial court's unique position for determining the credibility, sincerity, character and other intangibles of the witness, we presume awards of custody are made in the best interests of the children." *Flathers v. Flathers*, 948 S.W.2d 463, 471 (Mo.App.1997).

■ Here the trial court found that Jake's best interest favored the denial of mother's motion to relocate to Lawton, Oklahoma. The evidence adduced at trial and the trial court's findings on the credibility of the witnesses support the trial court's decision. We believe the trial court correctly declared and applied the law in this case, even though the trial court did not have the benefit of the teachings found in *Stowe v. Spence* at the time it rendered its decision. Since relocating in this case was not granted, the change in the law requiring the trial court to follow subsection 10 of section 452.377 if relocation were granted, has no bearing on this case.

We believe the trial court's finding that Jake enjoyed a close relationship with his father and that it was important to his happiness and emotional well-being was supported by the evidence. Also supported by the evidence was the trial court's finding that mother's move would not preserve and maintain father's existing relationship with Jake, and that the travel time would be negative and these detriments on Jake's quality of life out-weigh the benefits to be derived from the move. Additionally, the trial court's finding that the mother's motives in seeking relocation were questionable were supported by the evidence. The trial court obviously believed that neither mother nor her husband were willing to consider any option to stay in Carl Junction, and that mother was moving regardless of the trial court's decision.

The finding by the trial court that the move was not in the best interest of the child and was not made in good faith, correctly declared and applied the law as set out in *Stowe v. Spence,* 41 S.W.3d at 469.

The judgment is affirmed.

PREWITT, J. and BARNEY, C.J., concur.