BETTY A. McGUIRE, APPELLEE, V.
JAMES G. McGUIRE, APPELLANT.

652 N.W.2d 293

Filed October 1, 2002. No. A-01-513.

Thomas B. Donner for appellant.

Christopher J. Connolly, of Olds, Pieper & Connolly, and, on brief, Michael L. Nozicka for appellee.

IRWIN, Chief Judge, and HANNON and INBODY, Judges.

HANNON, Judge.

## INTRODUCTION

James G. McGuire appeals from the decree dissolving his marriage to Betty A. McGuire, alleging the trial court abused its discretion with respect to its treatment of his five life insurance policies; a $7,000 check from his father, used to help purchase the marital home; a debt incurred by Betty during the marriage to obtain a student loan for their daughter's education; and his retirement account, valuing it contrary to a stipulation of the parties. We conclude the debt incurred for the student loan is not a marital debt and should not be so treated, but otherwise, the disputed matters were within the discretion of the trial court. We therefore affirm as modified.

## BACKGROUND

James and Betty were married on June 21, 1975. Betty filed a petition for dissolution of marriage on July 31, 2000. A hearing was held on March 30, 2001, and the court rendered its decree dissolving the marriage on April 30. At the time of the dissolution, James was 52 years old and Betty was 45 years old. James was employed by Zach Propane Service, Inc. (Zach Propane),

earning $10.35 an hour, and Betty was employed as the city clerk for Wayne, Nebraska, earning $35,000 a year. Two children were born of the marriage: Jaime, on February 16, 1977; and Adam, on August 13, 1984.

The hearing began by counsel for the parties advising the court of a number of stipulations. Those stipulations were that (1) Betty would receive custody of Adam; (2) James would pay Betty $367 per month as child support; (3) Betty would maintain health insurance for Adam; (4) each party would pay his or her own attorney fees; (5) each party would keep the personal property and vehicles in his or her possession, and the value of the personal property held by each was of equal value; (6) James' retirement account has a value of $1,001 which reflects a discount of 25 percent afforded for the tax liability; (7) certain debts were valued as: home mortgage, $43,342; MBNA credit card, $14,700; Mark Johnson, $1,704; John Thor, $1,285; Baxter Brown, $363; Zach Oil, $457; Zach Propane, $385; and appraisal fee, $200; (8) Betty's retirement account would be split equally; (9) income from James' life insurance policies is sufficient to set off the premium; (10) no alimony would be awarded to either party; and (11) in the event the parties do not execute the necessary quitclaim deeds, bills of sale, or vehicle titles within 30 days after entry of the decree of dissolution, the decree would operate as if said deeds, bills of sale, or vehicle titles had been executed to conform with the decree. The treatment of certain items in which the parties could not agree on are discussed in more detail below and form the basis of this appeal.

*Life Insurance Policies.*

During the course of the marriage, five State Farm life insurance policies owned by James and insuring his life were acquired. Loans were incurred against some of the policies during the marriage. For over 5 years, the policies have been on a premium offset plan, where the interest and dividends pay the premium so that James has not had to come up with any out-of-pocket funds to do so. It was stipulated that provided the interest or dividend rates do not change and there are no other significant changes in the policies, there should be sufficient income to continue offsetting the premiums.

At the time of dissolution, the policies had an aggregate surrender value of $16,303.39 and a possible taxable gain of $48,029.14 if James were to surrender the policies. James admitted that only upon surrender of the policies would the taxable gain be attributable to him. He has complete control over whether or not the policies are ever surrendered. James said that he has no reason to surrender the policies at the present time or in the near future and that the policies do not need to be surrendered. He was asked why Betty should share in the tax if surrender was entirely in his control and if he saw no reason to surrender them in the foreseeable future. James answered, "Well, the foreseeable future, maybe they will be needed, but I don't see any need for it right now." Betty's position on the issue of deferred tax liability on the policies was that it was "speculative" and "bogus."

### $7,000 Check.

A check for $7,000 was given during the marriage by James' father, John McGuire (McGuire), and was made payable to James. James testified, "It was a gift to me to use as I saw fit." James said that the check was deposited into a joint checking account he held with Betty and that it was "possibly" used to pay a portion of the purchase price of the home. The check was dated April 20, 1993, and James and Betty closed on the real estate purchase on April 22, the same date the check was deposited. The parties took title to the property as joint tenants with right of survivorship. Both parties stated that there was never any discussion that the $7,000 was a separate, nonmarital asset.

James admitted that the check was delivered from McGuire as part of discussions with McGuire that James and Betty were trying to purchase a house. James was asked if he requested a specific amount of money from McGuire and answered, "I really don't remember the whole deal, just we seemed to be a little short on coming up with purchasing the home, and he said he had some extra money that maybe I could use . . . if I wanted to."

McGuire testified that James came to McGuire and said that James and Betty would be a little short on money to buy the house. McGuire said he wrote the check out and gave it to Betty. He testified the money was "to go to James and Betty to buy the house, make the down payment [sic] on the house." When asked

if McGuire intended to make that a gift to Betty as well, he answered, "Well, not really. I wouldn't — Jim came to me to ask for it. My kids need some money and I've got it, I usually give it to them. . . . I always liked Betty. I gave it to her at that time." The check was payable only to James, but McGuire said he did not know why he did not include Betty's name on it.

At the time of dissolution, the residence had an appraised value of $86,500, with $43,342 remaining on the mortgage. James said that since the $7,000 was used to acquire a house for $75,500, the appreciation in value of that asset, based upon the house's value of $86,500, would be $8,020.

*Student Loan.*

Although the petition for dissolution was filed on July 31, 2000, Betty and James continued to reside in the same house until October. James testified that they had lived in separate areas of the house and separately managed their affairs for approximately 3 years before he moved out. On January 18, 2000, while James and Betty were still married and living together, Betty took out a loan in the amount of $5,524 to enable their daughter, Jaime, to attend the Omaha School of Massage Therapy. Jaime was 22 years old at the time the loan was taken and had graduated from high school in 1995. After graduation, she had attended Wayne State College for 1 year and then went to Northeast Community College for a semester. In 1998, she moved to Omaha, Nebraska, and worked as a telemarketer for Omaha Steaks. Jaime was living independently and continued to work part time while attending school.

Betty signed the note as borrower and is solely responsible for paying that amount; Jaime is merely listed as the student, not a cosigner. Betty testified that she signed the note because Jaime had wanted to attend the Omaha School of Massage Therapy when she graduated from high school, but she could not afford to do so. Betty agreed that Jaime was "on her own" at the time. James said that neither Betty nor Jaime ever talked to him about this loan and that he did not know about it at the time. He said that Jaime should have to repay it. Betty testified that Jaime had indicated she might pay Betty back, and Betty hoped that one day when Jaime was established, she would pay it back, but it

was uncertain whether that would happen. Betty considered that loan to be a marital debt.

*Value of Retirement Account.*

James and Betty each asked the court to approve all the stipulations. One of the stipulations was that James had a retirement account with a value of $1,001, which reflected a discount of 25 percent for tax liability. James testified that this retirement account was through Zach Propane and that the value as of December 31, 2000, was $1,001, after the discount.

The court's decree states: "The parties entered into oral and written Stipulations prior to hearing, which Stipulations were received into evidence and are fair and reasonable in all respects. The Court specifically finds that said Stipulations are not unconscionable and are approved, and the parties are ordered to comply with the terms thereof." However, in its decree, the court valued James' retirement plan at $3,336.93.

*Property Division.*

In substance, the court's division of marital property was as follows:

| | Betty | James |
|---|---|---|
| Real estate | $86,500.00 | |
| State Farm life insurance policies (5) | | $16,303.39 |
| Betty's 457 deferred compensation plan | 50% | 50% |
| Knights of Columbus insurance policy | | 366.00 |
| James' profit-sharing plan | | 3,336.93 |
| Total Assets | $86,500.00 | $20,006.32 |
| | | |
| Mortgage on home | $43,342.00 | |
| Nebraska student loan program | 5,524.00 | |
| MBNA credit | 14,700.00 | |
| 2000 real estate taxes ($1,424 total) | 356.00 | $ 1,068.00 |
| Appraisal fee | 200.00 | |
| Mark Johnson | | 1,704.00 |
| John Thor | | 1,285.00 |

| | | |
|---|---|---|
| Baxter Brown | | 363.00 |
| Zach Oil | | 457.00 |
| Zach Propane | | 385.00 |
| Total Liabilities | $64,122.00 | $ 5,262.00 |
| Net Marital Estate | $22,378.00 | $14,744.32 |
| Sum to equalize | - 3,816.84 | + 3,816.84 |
| Property Division | $18,561.16 | $18,561.16 |

The court explained that it valued James' profit-sharing plan as the balance of his account as set forth in exhibit 29. In accordance with Neb. Rev. Stat. § 42-366(8) (Reissue 1998), the figure of $3,336.93 included both the vested and nonvested portions. The court did not include any potential tax consequences in the valuation of the life insurance policies and noted that the evidence showed any taxes to be speculative. Relying on *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995), the court stated there must be expert testimony in the record as to potential tax liability before a court can reduce the value due to anticipated income taxes.

Further, the court treated the $7,000 check as marital property, since it was undisputed that the money was given for the purpose of purchasing the marital home. The evidence did not clearly establish the gift to be solely to James, and the money went immediately toward a jointly owned home as intended. Finally, the student loan debt for Jaime was treated as a marital debt, since it was undisputedly incurred during the marriage. James timely appealed from this order.

## ASSIGNMENTS OF ERROR

James alleges the trial court erred in (1) determining the value of the life insurance policies without consideration of the income tax liability, (2) determining that expert testimony as to potential income tax liability was needed before the court could reduce the value of the life insurance policies for income tax liability, (3) determining that the evidence adduced was not sufficient as to the potential income tax liability on the life insurance policies, (4) failing to determine that $7,000 from McGuire was a gift traceable to the marital home that should be set off as a nonmarital asset, (5) failing to include the appreciation of the

marital home attributable to the $7,000 as a nonmarital asset, (6) failing to include the value of the obligation of Jaime to repay the educational debt as a marital asset, (7) valuing his retirement account in disregard of the parties' stipulation, and (8) determining the property settlement award.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Carter v. Carter,* 261 Neb. 881, 626 N.W.2d 576 (2001).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Heald v. Heald,* 259 Neb. 604, 611 N.W.2d 598 (2000).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Kearney v. Kearney, ante* p. 88, 644 N.W.2d 171 (2002).

## ANALYSIS

*Life Insurance Policies.*

James' first three assignments of error relate to the five life insurance policies he owned and was awarded in the dissolution decree at cash surrender value. An exhibit in evidence shows the policy number, face value, anniversary date, annual premium, cash surrender value, dividend, accumulated dividend, loan balance, and taxable gain for each policy. It shows the total cash surrender value to be $16,303.39 and the total taxable gain to be

$48,029.14. James first argues that the income tax liability upon surrender should have been considered in determining the value of the policies. He contends that under the rationale of *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988), the surrender of an account is not necessary to consider the income tax liability.

In *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995), the issue on appeal was whether a retirement account should be discounted for possible future taxes. The Nebraska Supreme Court noted that in *Buche, supra*, it had adjusted the valuation of a retirement account in the marital estate by approximately 25 percent and had held that the income tax, which would have to be paid eventually, was a proper consideration in determining the present value of the account. In *Buche*, an accountant testified as to the tax consequences associated with the account. In *Jirkovsky*, the Nebraska Supreme Court noted that the reduction due to potential income tax liability was not supported by the evidence, that there was no expert testimony in the record of the tax consequences associated with the retirement accounts, and that there was no testimony as to whether the accounts would be withdrawn at any particular time. Thus, the court reversed the Court of Appeals' decision which reduced the IRA and Keogh accounts by 25 percent. The *Jirkovsky* court stated that *Buche* does not stand for the proposition that a 25-percent reduction for taxes is appropriate in every case and further stated that the rate of income tax may vary from case to case, depending upon the circumstances of the payor.

The issue in the instant case relates to life insurance policies, not retirement accounts. No expert testimony was offered on the income tax penalty, and James stated that he did not plan to surrender the policies in the foreseeable future. Based on *Jirkovsky* and *Buche*, as well as James' testimony which did not establish that the insurance policies would be surrendered in the reasonably near future, we find that the district court did not abuse its discretion in valuing the life insurance policies at their cash surrender value.

*$7,000 Check.*
James claims that the $7,000 check from McGuire was a gift to James and should be treated as nonmarital property. That money

was put into a joint checking account and used to purchase the marital home to which James and Betty took title as joint tenants with right of survivorship. James also contends that he should get appreciation on the $7,000 investment in the house.

As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998). With some exceptions, the marital estate does not include property acquired by one of the parties through gift or inheritance. *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). The burden of proof to show that property is nonmarital remains with the person making the claim. *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999). Although James' testimony was that the check was a gift to him, he failed to meet the burden of showing that the money was clearly a gift to him only and not to the marital estate. James, Betty, and McGuire all seem to agree that the money was given specifically to help purchase the home which James and Betty were to live in during the marriage and which was jointly titled in their names. This is not a situation where money should be set off to one party, because McGuire's intent in giving the money was to benefit the marital estate, both James and Betty. It is the intent of McGuire, the donor, and the method by which the parties used the money that controls. We therefore conclude that the district court did not abuse its discretion in including this sum of money in the marital estate.

*Debt on Student Loan.*

The trial court ordered Betty to pay the student loan she incurred for Jaime's education, but included it with the other debts Betty was ordered to pay and then used the total of the debts to determine the net value of the property Betty received, for the purpose of determining that she should pay James $3,816.84 to equalize the property distribution. In effect, the decree makes James bear the burden of one-half of the $5,524 student loan. In the decree, the trial court stated: "It is undisputed that the student loan debt for [Jaime] was incurred by [Betty] during the course of the marriage. This is by definition a marital debt."

James assigns this as error. He cites *Zetterman v. Zetterman*, 245 Neb. 255, 512 N.W.2d 622 (1994) (holding that district court can enforce provision for support of adult child when decree was based upon agreement), and *Kimbrough v. Kimbrough*, 228 Neb. 358, 422 N.W.2d 556 (1988) (holding that dissolution court did not have jurisdiction to order father to provide medical insurance for adult child). James asserts that the student loan is a nonmarital debt that should be paid by Betty. Betty argues that it was incurred during the marriage—6 months before this action was filed and more than 15 months before the decree was entered.

We can find no definition of the term "marital debt" in Nebraska case law, but the Nebraska Supreme Court has used it. Other states have defined the term, and a review of their definitions might be helpful.

In *In re Marriage of Welch*, 795 S.W.2d 640 (Mo. App. 1990), the court reviewed Missouri cases at that time and concluded that since its statute defined marital property as all property acquired by either spouse during the marriage or in contemplation of the marriage, "marital debt" should be similarly defined as all debt incurred by either party during the marriage or in contemplation of the marriage. The *Welch* court also held that marital debt was not limited to that which was jointly incurred, nor must both spouses control or actively participate in the decision to incur the debt. The case recognized that the trial court had discretion in allocating such marital debt, but not nonmarital debt. In the more recent case *In re Marriage of Pahlow*, 39 S.W.3d 87 (Mo. App. 2001), some corporate stock and the debt incurred by the husband to buy it were both held to be marital transactions, even though the parties were separated and the wife did not know about the transactions. The decision was based upon the statutory definition of "marital property," which was essentially all property acquired by either spouse during the marriage except gift or inheritance. However, Missouri courts have found facts other than when the debt was incurred to be relevant. In *Hicks v. Hicks*, 969 S.W.2d 840 (Mo. App. 1998), the above definition was stated and followed where a husband was required to pay one-half of a wife's student loan incurred during the marriage and one-half the debt remaining on a vehicle purchased by the wife even though the husband disagreed with its

purchase. However, the *Hicks* court noted that both debts were "used to benefit the marriage." *Id.* at 846. In *Wright v. Wright*, 1 S.W.3d 52 (Mo. App. 1999), the wife had borrowed $8,400. She deposited $5,000 into the parties' joint checking account, used $900 to pay off the balance on the parties' Visa card, and applied $2,500 on a Discover card balance. She testified that the parties still owed $2,660 on their Discover card and that she borrowed $7,000 from her father immediately following their separation, which loan she spent on house payments and repairs, car payments, and groceries. The husband testified that he did not know about these transactions, but she testified that he did. The trial court found that the husband should not have to pay the $8,400 debt, the Discover card balance, or the debt to the wife's father, but the trial court somewhat inconsistently called these debts "marital debts." Interestingly, the appellate court found, without explanation, that the record would support either finding that these debts were or were not marital debts, and the appellate court remanded the case to the trial court for a determination of that issue. These cases cannot be summarized as a holding that all debts incurred during the marriage are marital debts, in spite of the broad definitions used.

In *In re Marriage of Scoffield*, 258 Mont. 337, 852 P.2d 664 (1993), the Montana court cited the rationale from the Missouri cases and concluded that the Montana statutory definition of marital property required that debts incurred by the wife on behalf of her children from a prior marriage were marital debts. More recently, in *In re Marriage of Gochanour*, 300 Mont. 155, 4 P.3d 643 (2000), the Montana court concluded that it was within the discretion of the trial court to determine that the ex-wife's medical costs incurred during the marriage for her cancer treatment were marital debts.

In *Schweizer v. Schweizer*, 301 Md. 626, 636-37, 484 A.2d 267, 272 (1984), the Maryland court stated that "a 'marital debt' is a debt which is directly traceable to the acquisition of marital property. Conversely, a 'nonmarital debt' is a debt which is not directly traceable to the acquisition of marital property." However, the opinion states that nonmarital debt may be considered in determining the amount of any monetary award. See, also, *Welsh v. Welsh*, 135 Md. App. 29, 761 A.2d 949 (2000).

In *Sien v. Sien*, 889 P.2d 1268, 1272 (Okla. App. 1994), marital debt was defined as "one which is jointly acquired in furtherance of a marital goal," and a debt incurred during the marriage in furtherance of the marital goals of establishing a family farm was held to be a marital debt.

A North Carolina court defined a marital debt as one "incurred during the marriage for the joint benefit of the parties." *Geer v. Geer*, 84 N.C. App. 471, 475, 353 S.E.2d 427, 429 (1987). See, also, *Becker v. Becker*, 127 N.C. App. 409, 489 S.E.2d 909 (1997) (holding that debt for husband's dental work is not marital debt). In *Crisp v. Crisp*, 126 N.C. App. 625, 486 S.E.2d 485 (1997), debts incurred for the medical treatment of the husband's daughter who lived with the parties were held to be the separate debts of the husband.

In *Thomas v. Thomas*, 346 S.C. 20, 27, 550 S.E.2d 580, 584 (2001), the court held that "[m]arital debt is debt incurred for the joint benefit of the parties regardless of whether the parties are legally jointly liable for the debt." In *Hickum v. Hickum*, 320 S.C. 97, 463 S.E.2d 321 (1995), the court stated that "marital debt" is the debt incurred for the joint benefit of the parties regardless of whether or not the parties are legally jointly liable for the debt and that the burden of proving a spouse's debt as nonmarital rests upon the party who makes such an assertion. The court also noted that a South Carolina statute, S.C. Code Ann. § 20-7-472 (Supp. 1994), "creates a presumption that a debt of either spouse incurred prior to marital litigation is a marital debt, and must be factored into the totality of equitable apportionment. The presumption is rebuttable." 320 S.C. at 102, 463 S.E.2d at 324. Accord *Hardy v. Hardy*, 311 S.C. 433, 429 S.E.2d 811 (1993).

■ Upon study of the cited cases, it appears the courts that defined the term "marital debt" did so with reference to their definition of "marital property." In Nebraska, as a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998). With some exceptions, the marital estate does not include property acquired by one of the parties through gift or inheritance. *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). It has also been said that the marital

estate includes property accumulated and acquired during the marriage through the joint efforts of the parties. *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002); *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000). If a gift received by a spouse is considered nonmarital, it seems logical that a debt incurred by a spouse in connection with nonmarital property would be nonmarital. If the marital estate is defined as property acquired by the parties' joint efforts, it seems that marital debts should have an element of being incurred as part of that joint effort. Even those courts that define marital debt to be all debts incurred by the parties during the marriage generally manage to interpret that definition to include elements that in some way consider whether the debt was incurred for the benefit of the marriage, the parties' joint benefit, in payment of a marital obligation, or some similar limitation.

While Nebraska courts have not defined the term "marital debt," they have made determinations of whether certain obligations were or were not marital debts or at least whether they should be treated as the joint obligation of the parties. In *Preston v. Preston*, 241 Neb. 181, 486 N.W.2d 902 (1992), the husband had inherited property and $22,342 of it was traced to his purchase of a corporation through which he operated an ambulance service. He also incurred debt in connection with that purchase. The corporation failed and had very little value. The husband was awarded the stock of that corporation and required to pay all debts in connection therewith, but the remainder of the parties' property and debts were divided equally. The debt was clearly incurred during the marriage, but it was incurred in connection with the management of nonmarital property. In *Hildebrand v. Hildebrand*, 239 Neb. 605, 477 N.W.2d 1 (1991), the wife had a balance of approximately $1,500 to $1,600 on her Visa card, which debt she testified was incurred for the parties' boat and expenses for their handicapped adult child. She requested that the husband pay $500 of this balance. The *Hildebrand* court found that the trial court was in error by ignoring this request and ordered the husband to pay $500 of the debt, "since the evidence is uncontroverted that part of the $1,500 to $1,600 debt was incurred for family expenses." *Id.* at 616, 477 N.W.2d at 8. The *Hildebrand* court did not specifically say so, but since the

expense for the family's boat was certainly a marital debt, this holding at least implies that payments to help an adult child in need are not a family expense of the parents.

In Nebraska, medical expenses incurred during the marriage are the joint debts of the parties. See *Choat v. Choat*, 218 Neb. 875, 359 N.W.2d 810 (1984). It has also been held that "income tax liabilities incurred during the marriage are one of the costs of producing marital income, and thus should be treated as a marital debt." *Meints v. Meints*, 258 Neb. 1017, 1018-19, 608 N.W.2d 564, 566 (2000). On that basis, the *Meints* court ordered a wife to pay one-half the income tax due on the husband's late-filed income tax return, but not to pay any of the penalty and interest resulting from his filing the return late. The court in *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001), discussed the rule from *Meints* and the need to inquire whether in *Carter* the husband spent significant funds on nonmarital pursuits in order to determine if the original tax principal was a marital or nonmarital debt. The husband testified that some money was lost on a concert and some on a failed business and that the rest was used for the parties' living expenses for 2 years. The wife testified that she was not aware of the husband's business investments until after the fact, that she did not have access to the money held in an account in the husband's name, that he never contributed any money to the household, and that some of the money was used by the husband to gamble or to pay gambling debts. The court determined that the husband spent significant funds on nonmarital pursuits and held that the trial court abused its discretion when it ordered the wife to pay one-half of the original tax principal.

In *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999), the trial court's property division, which took into account a debt of $20,000 that the husband testified he borrowed from his mother to pay off debts and had to pay back, was affirmed. The Supreme Court stated that the wife did not dispute that the debt was a valid marital debt. In *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000), this court concluded that it was not error for the trial court to assign to the wife all of a student loan debt incurred by the wife during the marriage to attend law school, even when that debt exceeded the direct cost of her attending school. In *Mathew*

*v. Palmer*, 8 Neb. App. 128, 589 N.W.2d 343 (1999), this court treated a debt incurred by the parties to pay credit card debt and a debt to the husband's mother as nonmarital debts of the husband, because the evidence showed these debts arose from credit card debts incurred by the husband to support his indolent lifestyle. In *Connealy v. Connealy*, 7 Neb. App. 117, 123, 578 N.W.2d 912, 916 (1998), this court held that neither a $15,000 debt incurred in connection with a piano the husband had owned prior to the marriage nor a $12,000 debt incurred by the wife during the marriage to secure a " 'Mini Mart' " for her son should be considered a marital debt.

■ Based upon the definition of marital property in Nebraska and a study of the cases cited above, we think the following definition is most in accord with Nebraska case law: A marital debt is "one incurred during marriage and before date of separation by either spouse or both spouses for joint benefit of parties." 24 Am. Jur. 2d *Divorce and Separation* § 571 at 730 (1998). We find no support for the definition of marital debt used by the trial court in the instant case.

■ When the parties disagree on whether a given debt is a marital debt, the question of who has the burden of proof on that issue necessarily arises. South Carolina places the burden of proof on the party who asserts that the debt is nonmarital. See, *Hickum v. Hickum*, 320 S.C. 97, 463 S.E.2d 321 (1995); *Hardy v. Hardy*, 311 S.C. 433, 429 S.E.2d 811 (1993). But North Carolina puts the burden of proof on the party seeking to classify the debt as marital. See, *Riggs v. Riggs*, 124 N.C. App. 647, 478 S.E.2d 211 (1996); *Byrd v. Owens*, 86 N.C. App. 418, 358 S.E.2d 102 (1987). The party who claims the debt is marital then has the burden to prove that it was incurred during the marriage and for the joint benefit of the parties. *Riggs, supra.* As we noted above, the Nebraska cases hold that the burden of proof to show that property is nonmarital remains with the person making the claim. *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999). We therefore conclude that in this state, the burden to prove that a debt is nonmarital is on the party making that claim.

In the instant case, the parties were estranged at the time of the loan, which was taken out in Betty's name roughly 7 months before she filed for divorce. The loan was to enable Jaime, the

parties' adult child who had attended post high school education for 2 years and had established herself separately in Omaha, to attend the Omaha School of Massage Therapy. Betty did not discuss the matter with James before the loan was taken out. The loan was not incurred to satisfy an obligation of either party. The evidence therefore shows that the debt was not incurred for the joint benefit of the parties, but, rather, it was incurred by Betty for the benefit of Jaime. We conclude that the court abused its discretion by computing a distribution which effectively made James pay one-half of that debt. This error can be most easily corrected by increasing the amount that Betty is required to pay James to equalize distribution by one-half the amount of the student loan debt used in the trial court's computation, that is, by $2,762.

*Stipulation as to Profit-Sharing Plan.*

■ The parties stipulated that James would be awarded his retirement account and that the value of James' retirement account was $1,001, which amount included a discount of 25 percent due to deferred tax liability. Both parties asked that the court accept the stipulations, which implies an understanding that the court could either accept or reject the stipulations. The decree states that the court specifically found that the stipulations were not unconscionable and were approved. However, the court, relying on § 42-366(8), included both the vested and nonvested portions of the retirement account and valued it at $3,336.93. Section 42-366(8) states:

> If the parties fail to agree upon a property settlement which the court finds to be conscionable, the court shall order an equitable division of the marital estate. *The court shall include as part of the marital estate*, for purposes of the division of property at the time of dissolution, *any* pension plans, *retirement plans*, annuities, and other deferred compensation benefits owned by either party, *whether vested or not vested.*

(Emphasis supplied.)

The above statute does not require any specific method of valuation, and the trial court retains broad discretion in valuing pension and retirement plan rights. See *Rockwood v. Rockwood,* 219 Neb. 21, 360 N.W.2d 497 (1985).

 Stipulations voluntarily entered into between the parties to a cause or their attorneys, for the government of their conduct and the control of their rights during the trial or progress of the cause, will be respected and enforced by the courts, where such stipulations are not contrary to good morals or sound public policy. *In re Estate of Mithofer*, 243 Neb. 722, 502 N.W.2d 454 (1993). Courts will enforce valid stipulations unless some good cause is shown for declining to do so, especially where the stipulations have been acted upon so that the parties could not be placed in status quo. *Id.*

The question is whether the district court was bound to accept and incorporate into the decree a stipulation of the parties which is contrary to the evidence and the law. Exhibit 29 shows that as of July 31, 2000, the balance of James' profit-sharing plan was $3,336.93, that 40 percent was vested, and that the vested amount was $1,334.77.

 The Nebraska Supreme Court has stated: "It is the duty of the court to scrutinize settlement agreements closely in divorce actions and to protect against fraud, intimidation, and ignorance and guard against unconscionable results. The court is required to render a fair and equitable result under all the circumstances." *Diers v. Diers*, 185 Neb. 552, 557, 177 N.W.2d 503, 506 (1970). Although the court's valuation of the profit-sharing plan may be contrary to the stipulation of the parties, it is supported by the evidence. The court is bound to render a fair and equitable result, and since exhibit 29 set forth the vested and nonvested portions of the plan, we cannot find the inclusion of such values to be an abuse of the trial court's broad discretion.

*Property Division.*

According to Neb. Rev. Stat. § 42-365 (Reissue 1998):

When dissolution of a marriage is decreed, the court may order . . . division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, [and] a history of the contributions to the marriage by each party . . . .

. . . The purpose of a property division is to distribute the marital assets equitably between the parties.

 The Nebraska Supreme Court has repeatedly stated that the ultimate test in determining the appropriateness of the division

of property is fairness and reasonableness as determined by the facts of each case. *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995). After reviewing the record, we cannot say the district court abused its discretion in making an equal division of the marital estate.

## CONCLUSION

We generally affirm the decree of the trial court, but modify it to change the treatment of the student loan by increasing the amount Betty is required to pay James from $3,816.84 to $6,578.84. The decree provided that Betty was to tender the payment to equalize by July 1, 2001 (a date 2 months after the decree was entered). In view of the increase in the amount, the decree should be modified to provide that the payment to equalize shall be made within 90 days after the mandate is issued.

AFFIRMED AS MODIFIED.