GARY DEAN HUGHES, APPELLEE, V.
MARY BETH HUGHES, APPELLANT.

706 N.W.2d 569

Filed November 22, 2005.   No. A-04-939.

Heather Swanson-Murray and Mandi J. Schweitzer, of Yeagley & Swanson-Murray, L.L.C., for appellant.

John O. Sennett and Julianna S. Jenkins, of Sennett, Duncan, Borders & Jenkins, for appellee.

SIEVERS, CARLSON, and CASSEL, Judges.

SIEVERS, Judge.

## I. INTRODUCTION

Mary Beth Hughes appeals the order of the Garfield County District Court, which dissolved her marriage to Gary Dean Hughes. The case is complicated by the fact that assets from Gary's deceased mother's trust have been improperly transferred and are now part of property which must be dealt with in this dissolution action, and the evidence does not allow accurate tracing of such trust assets.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Gary and Mary were married on May 26, 1979. At the time of the June 15, 2004, trial, Gary was 51 years old and Mary was 46 years old. During the marriage, the parties had two children and adopted a third child. At the time of trial, the parties' son, Jason, was 24 years old, and their daughter Kaycee was 19. Allison, born April 6, 1994, was the only child at issue in the proceedings.

Gary is employed with the North Loup River Public Power and Irrigation District, earning a gross monthly salary of $1,875. Until 1993, Mary was employed outside the home. From 1993 until the parties' separation, Mary stayed home as the primary caregiver for the children and operated the parties' business on a property known as Trapper's Creek. At the time of trial, Mary worked as a seasonal employee, earning $5.50 per hour, for 40 hours per week from May to October. She testified that she would need to obtain other employment and that she had a "[s]ecretarial" associate degree. Mary said that there was employment available in the area, much of it secretarial work for $8 per hour.

On September 18, 1992, the parties purchased the real estate known as Trapper's Creek for $110,000, on which property they later operated the aforementioned business. Emma A. Hughes, Gary's mother, loaned the parties $40,000 for the purchase of Trapper's Creek, and the parties obtained a loan for the remaining $70,000 from another source. At the time of trial, there was still a debt of $24,296.86 associated with Trapper's Creek. The debt did not include the loan from Emma, which was forgiven when she died. Trapper's Creek includes a cabin and some land used for "recreation," such as hunting and fishing, as well as approximately 80 acres used for growing alfalfa. Trapper's Creek is located next to land owned by the " 'Emma A. Hughes Family Trust' " (Emma's trust). The land owned by the trust includes 80 acres, as well as two residences, one of which Gary and Mary lived in, rent free and tax free, during their entire marriage. Gary became the trustee of Emma's trust upon her death in October 1993.

Emma's trust provided, among other things, that $25,000 each in life insurance proceeds would be distributed to Gary, Mary, Jason, and Kaycee. Gary would receive the income from the trust's 80 acres and two residences until age 65. The trust provides that when Gary reaches 65, the real estate will pass to Jason and Kaycee, free of the trust. As for the residue of the trust, meaning all assets except the 80 acres and the two residences, half is to be "allocated" to Gary, from which half he is to receive the income until age 65, at which time the principal and any then accumulated income of his allocation will be distributed to him.

The other half of the residue is to be divided by allocating a quarter of the total to Jason and the remaining quarter to Kaycee. The interest or income on Jason's and Kaycee's allocations "shall be accumulated and become a part of the principal" until each attains the age of 21. From age 21 to 25, they each will receive the earnings on their allocations. Upon reaching age 25, they each are to receive half the principal remaining in their allocations of Emma's trust. At age 30, each will receive the balance of their allocations of Emma's trust, free of the trust. We note that the only separate trusts to be established via Emma's trust are two separate "educational" trusts for Jason and Kaycee to be funded by $25,000 per child from Emma's life insurance proceeds, which we have previously mentioned. Otherwise, Emma's trust is to remain intact, with a "residuary miscellaneous account" to be allocated as discussed above—Emma's trust does not provide for the establishment of separate trusts to handle the allocations. However, the record reveals that at some point, separate trusts, in addition to the educational trusts, were established by Gary for Jason and Kaycee using assets from Emma's trust; but the details about how this was done and the assets used to fund the trusts are extremely sketchy. We point out these facts at this time as a precursor to our later finding that transfers by Gary from Jason's, Kaycee's, and Emma's trusts to a trust which Mary established for herself were improper.

On March 30, 1994, Gary and Mary each executed separate living revocable trusts. On that same day, Gary and Mary conveyed a one-half interest in Trapper's Creek to each of their trusts. Mary testified that she received $25,000 in life insurance proceeds from Emma's trust, but that she could not definitely say that the entire amount went into the "Mary B. Hughes Living Revocable Trust" (Mary's trust). In October 2000, Gary signed letters authorizing the transfer to Mary's trust of 70 shares of "Microsoft" from Kaycee's trust, 145 shares of "Qwest Communications" from Emma's trust, and 256 shares of "Bank One" as well as 25 shares of "Sun Microsystems" from Jason's trust. The evidence at trial showed that the investment or brokerage account in Mary's trust was valued at $63,369.23 as of August 29, 2003.

Gary testified that Emma's trust paid for approximately $25,000 to $30,000 worth of "improvements" to Trapper's Creek which included putting in a well, a septic tank, and a deck; putting on siding; and redoing a roof and a chimney. Emma's trust sometimes paid the mortgage and real estate taxes on Trapper's Creek.

On July 13, 2004, the district court entered the decree dissolving the parties' marriage, awarding the care, custody, and control of Allison to Mary and ordering Gary to pay alimony of $100 per month for 10 years as well as child support of $387 per month to Mary. The district court also divided the parties' property, finding that Gary's "evidence was more credible than [Mary's] as to values and proposed disposition of the marital property." The court awarded Gary a credit for $38,369 "for funds inherited by him from [Emma's trust]" and found that there was evidence that funds from Emma's trust were used to improve Trapper's Creek, which improvements enhanced its value by "at least $20,000," resulting in a nonmarital credit in that amount to Gary. The district court also ordered Gary to pay Mary $68,324.67 in order to make the division of the property equal. Mary appeals.

### III. ASSIGNMENTS OF ERROR

Mary asserts that the district court erred in (1) awarding Trapper's Creek to Gary, (2) giving Gary a credit for an increase in the value of Trapper's Creek due to improvements which were paid for with Gary's inherited funds, (3) giving Gary a credit for $38,369 in inherited funds, (4) failing to give Mary a credit for $25,000 in inherited funds, and (5) failing to consider Gary's income from all sources in determining his child support and alimony obligations.

### IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Longo v. Longo*, 266 Neb. 171, 663 N.W.2d 604 (2003).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002). However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.* A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Velehradsky v. Velehradsky*, 13 Neb. App. 27, 688 N.W.2d 626 (2004).

## V. ANALYSIS

### 1. DISTRICT COURT'S DIVISION OF PROPERTY

We set forth the district court's calculation of how the property was valued and divided:

| Item | Gary | Mary | Total |
|---|---|---|---|
| Household Goods | $ 6,270.00 | $ 10,325.00 | $ 16,595.00 |
| Checking and Savings | 3,896.64 | 2,123.52 | 6,020.16 |
| Vehicles | 5,995.00 | 12,350.00 | 18,345.00 |
| Farm and Business | 13,910.00 | 13,071.00 | 26,981.00 |
| Real Estate | 207,284.00 | 0.00 | 207,284.00 |
| Life Insurance | 95,474.46 | 75,527.26 | 171,001.72 |
| Miscellaneous | 6,419.00 | 1,017.00 | 7,436.00 |
| | $339,249.10 | $114,413.78 | $453,662.88 |
| | | | |
| Mortgages | ($ 24,296.86) | $ 0.00 | ($ 24,296.86) |
| Secured Creditors | (3,812.04) | 0.00 | (3,812.04) |
| Unsecured Creditors | (1,726.68) | (18.60) | (1,745.28) |
| | $309,413.52 | $114,395.18 | $423,808.70 |
| | | | |
| Mary's Trust<br>(funds from Emma's Trust) | (38,369.00) | | (38,369.00) |
| | | | |
| Emma's Trust<br>(funds from Trapper's Creek) | (20,000.00) | | (20,000.00) |
| | $2[5]1,044.52 | $114,395.18 | $3[6]5,439.70 |

The court divided what it considered as the marital estate so as to give each party an equal share (\$365,439.70 ÷ 2 = \$182,719.85), which division resulted in an equalization payment of \$68,324.67 (\$182,719.85 – \$114,395.18) from Gary to Mary that the court ordered to be paid within 90 days.

■ Mary's assignments of error concerning the property division call into question the trial court's methodology in determining and dividing the marital estate. The proper methodology, a three-step sequential process, is now firmly established. See *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.*

### (a) Trapper's Creek

■ Mary asserts that the trial court erred in awarding Gary Trapper's Creek. The purpose of a property division is to distribute the marital assets equitably between the parties. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.* Mary was awarded one-half of the marital estate by the trial court. Gary testified that Trapper's Creek did not generate enough income to pay for the improvements to that property or to pay the principal and interest payments, real estate taxes, and expenses associated with the property. Because Trapper's Creek did not generate enough income, Emma's trust was used to pay many of the financial obligations for Trapper's Creek. Therefore, as a practical matter, had Mary been awarded Trapper's Creek, at a value of \$50,000 as she desired, she would have needed a source of income to help fund and operate the business, in addition to needing to pay Gary a judgment to equalize the property division; and we note that there is no credible evidence that Trapper's Creek is worth only \$50,000. The evidence is that Trapper's Creek has never made a profit and that secretarial work, which comports with Mary's education,

skills, and experience, is readily available for her. Moreover, Trapper's Creek is directly adjacent to the real property owned by Emma's trust, including the residence in which Gary has a life estate, making an award of Trapper's Creek to Mary an awkward proposition. For all of these reasons, the trial court did not err in awarding Trapper's Creek to Gary.

### (b) Improvements to Trapper's Creek

Mary asserts that the district court erred in giving Gary credit for "funds expended on Trapper's Creek from [Emma's trust] during the marriage." Brief for appellant at 18. The district court's decree states that the court found "credible evidence to warrant a credit to [Gary] for funds [that] were used from [Emma's trust] to improve the Trapper's Creek property and that such improvements enhanced the value of Trapper's Creek by at least $20,000." The appraisal of Trapper's Creek cited by the court for the latter finding is dated August 28, 2003, and states that at Trapper's Creek, the dryland is worth $15,080, the grassland and trees are worth $120,204, the cabin is worth $20,000, and the 80 acres being used for alfalfa are worth $52,000, for a total value of $207,284.

The September 1992 purchase agreement for Trapper's Creek allocates the purchase price among various aspects of the property, including $25,000 for the "house," now referred to as "the cabin"; $2,500 for a "domestic well"; and $75,000 for the land and fences. Although we recognize that such allocations can have secondary purposes somewhat affecting their reliability, in this instance, the allocations are worthy of note. The appraisal of Trapper's Creek in evidence at trial, mentioned above, shows that the land has increased in value by about $120,000, but that the cabin is now worth $5,000 less than was allocated to it in the purchase agreement. Moreover, the record does not tell us when the $25,000 to $30,000 from Emma's trust was spent on "improvements." The significance of this latter fact is that the appraisal used by the trial court is "as of" August 28, 2003, whereas the trial was over 10 months later on June 15, 2004. Thus, one predicate to any set-aside to Gary for the $25,000 to $30,000 spent on Trapper's Creek from Emma's trust, or for any portion thereof, is proof that these expenditures

are not already included in the August 28, 2003, appraisal, which values the entirety of Trapper's Creek at $207,284, including only $20,000 for the cabin. Gary's evidence does not fill this gap.

Additionally, no one testified that Trapper's Creek was "enhanced" by at least $20,000 as found by the trial court. In fact, Gary's testimony was that the cabin was in need of repairs and upkeep at the time of purchase. The increase in value of Trapper's Creek from 1992, when it was purchased, to 2003 is attributable to the land, not any enhancement of the cabin. These shortcomings in the evidence necessarily undercut the trial court's decision to set aside $20,000 to Gary for expenditures originating as inherited property from Emma's trust.

Mary concedes in her brief that funds from Emma's trust were used to pay for expenses and upkeep of Trapper's Creek. However, she claims that there is no evidence in the record showing "the value of the contribution upon which the claim is made." (Emphasis omitted.) Brief for appellant at 20. In support of this argument, she refers us to *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). *Tyler* held that property acquired by one spouse through gift or inheritance ordinarily is set aside to the individual receiving the inheritance or gift and is not considered a part of the marital estate, unless the other spouse has contributed to the improvement or operation of the property. However, in *Tyler*, the court made it clear that if this exception applies, evidence that the contributions were significant is required, as is evidence of the value of the contributions. However, this case is somewhat different, because Trapper's Creek is clearly marital property and the improvements and maintenance were paid for by Emma's trust. (We must make it clear that we are not, in any way, suggesting or deciding that this was a proper use of funds and assets in Emma's trust.) Nonetheless, the basic notion of *Tyler* about proof of value is applicable in a case such as this, where there is intermingling of marital property and inherited property. For inherited money expenditures to be set aside as nonmarital property, it is insufficient to simply show the amount of the expenditures when property is divided in a divorce, because it is elementary that cost or expenditure does not equate with value. Generally, we

look to the fair market value of an asset. See *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000). Where there is commingling of marital property and inherited funds, it is necessary that there be proof of the monetary effect of the inherited money expenditures on the value of the marital asset before it can be concluded that the party claiming the nonmarital property set aside has carried his or her burden of proof.

Our holding above seems to logically flow from the well-established rule that a set-aside of inherited property requires identification of the inherited property. See *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003) (if inheritance can be identified, it is to be set aside to inheriting spouse and eliminated from marital estate). In considering the matter of identification, it necessarily involves more than simply showing that the source of the funds spent on the marital property was a gift or inheritance. What is missing in the identification process in this record is evidence that the inherited money expenditures can be traced to something which has ascertainable value. See, e.g., *Ross v. Ross*, 219 Neb. 528, 364 N.W.2d 508 (1985). In the case of purported enhancement of a marital asset, it must be proved that such expenditures increased the value of the marital asset. In this case, proof is required that the expenditures on Trapper's Creek increased the value of that property as a whole, or the cabin in particular, given that the "improvements" to the cabin form the rationale for the trial court's set-aside of $20,000 to Gary.

There are other problems with the $20,000 set-aside to Gary. Gary testified that one of the expenditures for "improvements" was for a well, but no evidence as to an amount was provided. Additionally, the purchase agreement recited that $2,500 of the purchase price was allocated to a "domestic well," which strongly suggests that the property already had a water source. Therefore, absent evidence to the contrary, there is clearly a permissible inference from the record that the expenditure for a new well was not an improvement enhancing value, but merely "maintenance" to retain value and function. Without overworking this topic, it can be said that many of the other expenditures recited in Gary's testimony would appear to be for simply maintenance rather than improvements.

In summary, proof merely that money was spent on real estate does not establish that the real estate's value has been enhanced. Gary did not prove his entitlement to a set-aside as nonmarital property for expenditures from Emma's trust on Trapper's Creek. Therefore, in our revised property division, Trapper's Creek is all marital property to be included in the marital estate at a value of $207,284.

### (c) Treatment of Funds and Assets in Mary's Trust

#### (i) Mary's Life Insurance Proceeds From Emma

Mary also asserts that the district court erred in finding that there was "credible evidence to warrant a credit to [Gary] for funds inherited by him from [Emma's trust] in the amount of $38,369" and in not giving Mary a credit for the $25,000 she received from Emma's life insurance proceeds. An "SII Investments" (SII) account statement dated August 29, 2003, was used to prove the value of Mary's trust, which she established in March 1994. The statement shows the value of the SII account to be $63,369.23, comprising $562.56 in cash and the balance in stocks or mutual funds. Given stock market fluctuations, this account balance seems "stale" considering that the case was tried 10 months later. However, we can only use the evidence introduced by the parties. The district court awarded the full amount of the SII account to Mary, although incorrectly labeling it "Life Insurance." No nonmarital set-aside was made to Mary for any portion of the SII account. However, the trial court awarded Gary a nonmarital property credit of $38,369, which represents the balance of Mary's trust after $25,000 is subtracted from the rounded value of the SII account held by Mary's trust ($63,369 − $25,000 = $38,369).

As outlined earlier, Mary received $25,000 in life insurance proceeds upon Emma's death, pursuant to provisions of Emma's trust. This $25,000 would initially be Mary's separate property. See *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004) (property acquired through gift or inheritance ordinarily is set aside to individual receiving inheritance or gift and is not considered part of marital estate). See, also, *Ainslie v. Ainslie*, 4 Neb. App. 70, 538 N.W.2d 175 (1995). We dispense with further citation of authority, as the principles applied above to the issue of

the $20,000 set-aside to Gary are equally applicable in this discussion. The crucial issues are whether at the time of the divorce such funds still existed and, if not, whether they can be identified and traced to other existing assets. While Mary argues that the $25,000 from the life insurance is contained within her trust as the result of her investing and managing such money, her SII account contains only $562.56 in cash, and no evidence was introduced to establish that any of the stocks now found in Mary's SII account can be traced to the $25,000 she inherited from Emma.

On cross-examination, Mary first said that everything in her own trust but the $25,000 came from Emma's trust. She then said that it "was a little confusing with all of the money that came in after [Emma] died" and that she could not definitely say that "the $25,000.00 in cash" went into her own trust. Mary also admitted that she did not "know for sure" that such amount went into her trust. She ultimately admitted that transfers were made from Emma's trust, Gary's trust, or Jason's or Kaycee's trust to her trust. Mary had the burden of proof to show either that the SII account still contained the original $25,000 in cash—which it obviously did not—or that the stocks and mutual funds in such account could be traced to the $25,000, meaning that the original $25,000 has been "identified" by the evidence. A thorough examination of the record reveals that Mary failed to carry her burden of proof on this issue.

Searching the record for evidence of the source of the stocks and mutual funds in Mary's SII account is not fruitful other than revealing transfers of stock shown by four letters dated October 25, 2000, signed by Gary as trustee (for Emma's, Jason's, and Kaycee's trusts), directing a brokerage house to transfer to the SII account 70 shares of "Microsoft" from Kaycee's trust, 145 shares of "Qwest Communications" from Emma's trust, and 256 shares of "Bank One" as well as 25 shares of "Sun Microsystems" from Jason's trust. The evidence shows that as of August 29, 2003, there were 50 shares of "Sun Microsystems" and 140 shares of "Microsoft" in the SII account—twice the number of shares of these two stocks as were transferred pursuant to the letters. While a stock split might explain the increase in the number of shares, there is no evidence of such a split. In

any event, the stock in these four companies had a value of $14,658.27 in August 2003, and the evidence shows that such portion of the SII account cannot be traced to the $25,000. There is, of course, the unanswered question of how the other $48,710.96 in stock and mutual funds in the SII account was acquired—and it was Mary's burden to prove that such was acquired by use of the $25,000, as such fact cannot be assumed or presumed when the starting point in this analysis is her uncertain testimony about whether the $25,000 in life insurance proceeds from Emma was ever placed in her trust, as well as her statement in her testimony that "all the rest of the money" in her SII account "[p]robably" came from the other trusts, if she did not put the $25,000 in her trust. Therefore, on this record, the trial court did not err in failing to set aside $25,000 from the SII account to Mary as her separate inherited property.

### (ii) Gary's "Inheritance" From Emma of $38,369

We now turn to the $38,369 that the trial court set aside as a "credit to [Gary] for funds inherited by him from [Emma's trust]." Mary assigns this set-aside as error, asserting that such funds are part of the marital estate. Although the trial court did not explain how it arrived at this amount, it is evident that such figure is the balance in the SII account remaining after Mary's claim of $25,000 is deducted from the account's value and the difference is rounded to the nearest dollar. The import of the trial court's calculation is acceptance of Mary's assertion that the SII account contains $25,000 of her separate money, but rejection of her claim that such amount should be set aside to her, while at the same time Gary is awarded a credit, as his inherited property, of an amount equal to the balance of the SII account after a $25,000 deduction. While this award to Gary and the method of setting the amount may not be completely logical, our study of this case makes it apparent that Gary and Mary's cavalier treatment of the restrictions in Emma's trust has created a financial and accounting morass. Therefore, the lack of comprehensive evidence documenting and tracing their handling of Emma's trust assets may account for the district court's result. To put it another way, a rough record in a complicated

divorce case sometimes means that "rough justice" is the best that can be done.

With that prelude, we return to the subject of how the stocks in the SII account were acquired, and we now consider the provisions of Emma's trust. When the document creating that trust is closely studied, it is clear that the four transfers of stock detailed in the above-mentioned letters were improper, to the extent that such stock was corpus or traceable to corpus of the trust which was to be held in the residuary miscellaneous account of the trust (there was no proof by anyone that such stock was not corpus). The transfers were clearly improper because until Gary reached age 65, he had no right to access the principal of Emma's trust. And, obviously, he could not properly transfer principal to Mary or transfer money or assets representing Jason's and Kaycee's allocations of Emma's trust to himself or to Mary before he reached age 65. Other than the trust's 80 acres and the two residences earlier discussed, all of Emma's residuary estate was to remain in the residuary miscellaneous account of Emma's trust—allocated 50 percent to Gary and 25 percent each to Jason and Kaycee, but with the corpus of such allocations remaining "off limits" to the three beneficiaries, Gary, Kaycee, and Jason, at all times during the marriage (as well as for a considerable time in the future, because Gary is not entitled to receive any of the corpus until he is age 65; he was 51 at the time of the trial).

Although the district court's decree is silent on the propriety of the transfers of stock, we review the record de novo, and the issue of the set-aside to Gary of $38,369 as property inherited from Emma necessarily requires us to examine the propriety of the transfers. In addition to our finding above, we note that during oral argument of this appeal, Gary's counsel candidly conceded that the transfers were improper. And Gary admitted much the same at trial, as well as the fact that there were no provisions in Emma's trust authorizing him to use Emma's trust funds to pay mortgage payments and real estate taxes on Trapper's Creek, as was apparently routinely done. Therefore, because the evidence fails to show that the noncash assets of Mary's trust, 99 percent of the SII account, were the result of proper transfers

from Emma's trust, the assets in the SII account cannot be considered marital property and Mary's claim to that effect is clearly without merit.

That said, we hasten to point out that our conclusion about the impropriety of the transfers is reached only in the context of determining whether the trial court erred by not including the $38,369 under discussion in the marital estate, as Mary wants. Rejecting her assignment of error is a far different conclusion from saying that Gary was lawfully entitled to access the corpus of Emma's trust assets, including any that may now be residing in the SII account. The record strongly suggests that Gary and Mary routinely ignored the restrictive terms of Emma's trust.

The inheritance tax worksheet for Emma's estate shows that her net estate was approximately $651,000, of which $207,000 was attributed to the trust's 80 acres and, though they are not explicitly mentioned, the two residences. Thus, the "residuary miscellaneous account" of Emma's trust would contain approximately $444,000 of corpus. When the statements for the accounts which would make up the residuary miscellaneous account as of May 30, 2003, are examined, there is approximately $172,142 left—in a situation where no corpus of the residuary miscellaneous account could have yet been properly used or spent.

Clearly, there are entities and individuals, not parties to this action, who likely have potential claims against Gary, Mary, or both concerning the SII account, the transfers, and the handling of Emma's trust. Obviously, we cannot resolve such claims in this action, as neither the claims nor the parties are before us.

While Gary is ultimately the 50-percent beneficiary of the corpus of the trust, he may have a financial day of reckoning with the other beneficiaries—his children. Therefore, while the district court's set-aside to Gary of $38,369 as an inheritance is really not supported by the evidence and he certainly did not carry his burden to prove that such sum was his inherited property, the trial court's division will not be set aside. Our reasoning is simply that the result strikes us as a fair and equitable result—considering all of the unique circumstances we have detailed in this opinion, as well as other considerations which are revealed to some degree by the evidence. In other words,

this seems the best result that can be accomplished, and such result has the advantage of putting more assets in Gary's hands should the other beneficiaries seek to hold him accountable for his handling of Emma's trust. And, in the final analysis, in approximately 13 years, Gary is entitled to 50 percent of the residuary corpus.

This seems an appropriate point to recall that the division of property in a dissolution action is based on equitable principles and that the ultimate test for determining the appropriateness of a division of property is reasonableness as determined by the facts of each case. *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999). There is no mathematical formula by which such awards can be precisely determined, because each depends upon the facts of the particular case. *McCollister v. McCollister*, 219 Neb. 711, 365 N.W.2d 825 (1985). Finally, we note that the record is clear that Gary and Mary were both involved in the decisions about Emma's trust and that both participated in the transfers and usage of the trust's assets. Thus, while the result here may not be perfect and precise, we think it is as fair and equitable as we can make it, under these unusual circumstances, recalling what we said in *Griess v. Griess*, 9 Neb. App. 105, 116-17, 608 N.W.2d 217, 225 (2000):

> "[E]quitable remedies are a special blend of what is nec - essary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S. Ct. 1463, 36 L. Ed. 2d 151 (1973). In *Janke v. Chace*, 1 Neb. App. 114, 487 N.W.2d 301 (1992), we also said that where a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation.

To conclude this issue, we note that attached to the court's decree are a property statement and the court's property award and division worksheet, the latter document containing an award of "Life Insurance" in the amount of $75,527.26 to Mary. But, it really is not life insurance. Rather, it is $4,354.46 of "School retirement," $7,803.57 from "AmerUS Life," and the $63,369.23 from the SII account which total $75,527.26. Thus, Mary was actually awarded possession of the SII account containing the $63,369.23, and Gary's set-aside was accounted for

as a credit against this equalizing judgment to Mary. So that there is no misunderstanding, we point out here that we affirm that result. However, we hasten to add that our decision resolves the matter of possession and use of Mary's trust's SII account only as between Mary and Gary in his capacity as an individual, not as to Gary in his capacity as trustee of Emma's trust. In other words, our affirmance of the district court's award is not a finding, binding on those who might later assert claims against such account or against Gary (individually or as trustee) or Mary, that Mary or Gary is the lawful owner of any portion of the assets in the SII account. We simply leave the account in Mary's possession as an equalizing judgment and give Gary a credit against that equalizing judgment for a portion of the SII account. While it was possible for other persons or entities to have sought intervention in this action to assert claims against assets in the hands of Gary and Mary, no such relief was sought. See *Yelkin v. Yelkin*, 193 Neb. 789, 229 N.W.2d 59 (1975) (right of third parties to intervene in divorce proceedings is very limited, but may be permitted where it is necessary to procure justice for third persons whose property interest may be adversely affected in dissolution action). No potential claims of the various trusts and no claims of Jason and Kaycee are before us, and in any event, the record is inadequate to resolve any such claim. Compare *Parker v. Parker*, 1 Neb. App. 187, 492 N.W.2d 50 (1992) (district court erred in divorce action in attempting to mandate disposition of account under Nebraska Uniform Gifts to Minors Act, where parties' son was no longer minor).

### 2. CALCULATING AND DIVIDING MARITAL ESTATE

The second step in an equitable property division is to value the marital assets and marital liabilities of the parties. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in Neb. Rev. Stat. § 42-365 (Reissue 2004). *Medlock v. Medlock, supra.* No error is assigned to the district court's valuation of the property in the instant case; nor does either party claim that an equal division is not appropriate. Thus, we accept the district court's valuations as stated in the decree and accept its finding that the

marital estate should be equally divided. Our calculations using the three-step sequential methodology are as follows, after the modification previously outlined in this opinion:

| Assets | Gary | Mary |
|---|---|---|
| Household Goods | $ 6,270 | $10,325 |
| Checking and Savings | 3,897 | 2,124 |
| Vehicles | 5,995 | 12,350 |
| Farm and Business | 13,910 | 13,071 |
| Trapper's Creek | 207,284 | 0 |
| Life Insurance/Retirement | 95,474 | 12,158 |
| Miscellaneous | 6,419 | 1,017 |
| SII Account | | 25,000 |
| TOTAL | $339,249 | $76,045 |

| Liabilities | | |
|---|---|---|
| Mortgages | $ 24,297 | |
| Secured Creditors | 3,812 | |
| Unsecured Creditors | 1,727 | $ 19 |
| TOTAL | $ 29,836 | $ 19 |

| Net Value of Property Received | $309,413 | $76,026 |
|---|---|---|

Net Marital Estate:
$309,413 + $76,026 = $385,439 \div 2 = $192,719.50
Equalization Payment to Mary:
$192,719.50 - $76,026 = $116,693.50
Gary's Credit Against Judgment: $38,369
Mary's Equalizing Judgment From Gary: $78,324.50

Therefore, initially, Gary's equalization payment to Mary, rounded to the nearest dollar, was $116,693. However, because Mary retains all of the SII account in her possession and because Gary receives a credit for $38,369 of the SII account, requiring Gary to pay Mary a judgment which includes 50 percent of the $38,369 would constitute a substantial and un-deserved "windfall," given our previous discussion about the propriety of the handling of Emma's trust. Therefore, the equalization payment is reduced by $38,369 as the most straight - forward method of "balancing the ledger" between Gary and

Mary. The judgment to be paid by Gary to Mary is $78,324, and the district court's order is so modified. The district court's previous judgment of $68,324.67 was to be paid within 90 days of the entry of the decree. Therefore, Gary shall pay Mary the sum of $68,324 within 90 days after our mandate is issued, and the remaining balance of $10,000 shall be paid within 180 days of the issuance of the mandate. Interest shall not accrue on such amounts unless they are not timely paid, in which event the statutory interest rate on judgments in effect at the time when the delinquency occurs shall apply until such amounts are paid in full.

### 3. Gary's Income and Child Support

Mary argues that the trial court erred in failing to consider all of Gary's income in calculating child support and alimony. We agree as concerns child support. The trial court stated in its order that the child support calculation was based solely on Gary's "regular employment" because the "income from [Emma's trust] property appears sporadic and speculative." Paragraph D of the Nebraska Child Support Guidelines provides that in calculating child support, the total monthly income of both parties "from all sources" is to be used.

The record contains a "2003 Rental Agreement" for the "Hughes Family Trust Farm," which agreement provides that the tenants agreed to pay Emma's trust $135 per acre for 67.6 acres in 2003. Mary testified that this rent was paid; therefore, the trust received $9,126 in 2003 for farm rental, and Emma's trust directs that this income is to be paid to Gary, at least annually. Gary and Mary's 2002 joint income tax return shows that Emma's trust generated interest income of $1,468 and other income of $401. Gary and Mary's 2001 joint income tax return shows that Emma's trust produced interest income of $656, "or - dinary dividends" of $6,723, and other income of $2,488. Their 2001 return also shows rent received of $3,600 for the "farm house," which we assume to be the rental house located on Emma's trust property because Gary testified that he intended to rent out that house and that he previously received about $300 per month in rent from it. The parties' 2000 joint income tax return provides that the trust generated interest and ordinary

dividends of $5,256 and other income of $3,076 and that the farmhouse generated rent received of $300. Thus, the evidence in the record provides that the income Gary received from the trust is hardly speculative or uncertain, particularly with respect to the land and residences, although the amounts Gary is entitled to receive might vary somewhat from year to year. But, variance from year to year in the amounts received does not justify the total exclusion of the substantial income that Gary receives from the nonresiduary portion of Emma's trust.

From 2000 to 2003, Gary's average income from Emma's trust, calculated using the figures above, was $8,273.50. Using this 4-year average fairly and reasonably accounts for the variances in amounts from year to year. Including the trust income more accurately reflects Gary's earning capacity; earning capacity may be used in lieu of a parent's actual income, and it includes money available from all sources. See *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001). Moreover, The Nebraska Child Support Guidelines specifically allow for income averaging in certain circumstances. The fifth comment to worksheet 1 of the guidelines states, "In the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent contribution of each parent . . . ." Case law suggests that income averaging is to be used when there are yearly fluctuations, rather than when the supporting parent's income is consistently increasing or decreasing. See *Willcock v. Willcock*, 12 Neb. App. 422, 675 N.W.2d 721 (2004).

Thus, in addition to Gary's gross monthly employment income of $1,875, we find that his income from all sources includes at least an additional $8,273 per year. The trial court erred in not including Gary's income generated by Emma's trust when calculating child support. In our reworking of the child support worksheet, attached as appendix A, Gary's income, rounded to the nearest dollar, is $2,564 per month, resulting in a child support payment of $493 per month which shall be effective retroactively to July 1, 2004, the date provided in the trial court's decree. The trial court is directed to adopt our appendix A as its worksheet and to order child support as set forth above.

## 4. Alimony

Mary asserts that the district court erred in "establishing the alimony award to Mary without taking into consideration Gary's considerable nonmarital assets as well as in not considering Gary's income from those nonmarital assets." Brief for appellant at 26. In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* One of the predicates of Mary's argument concerning Gary's nonmarital assets has been undercut by our modification of the property division, as well as by the fact that the residuary miscellaneous account of Emma's trust has been improperly used by Gary—with Mary's admitted involvement.

The district court ordered Gary to pay $100 per month beginning July 1, 2004, for a period of 10 years. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id.*

Gary and Mary were married for 25 years. Gary's gross income from all sources is about $30,773 per year. Mary's gross income at the time of trial was about $11,400 per year, but she testified that she was looking for different employment and that she could obtain a secretarial position making $8 per hour, which calculates into a gross income of about $15,400. At the time of trial, Gary was 51 years old and Mary was 46 years old, and no health problems were discussed in the record which would interfere with either party's ability to work. During the marriage, the parties lived in a home owned by Emma's trust

without payment of rent or taxes; thus, there is no marital home for Mary and the parties' daughter Allison. However, Mary will receive a substantial cash payment within 90 days of our mandate which should mitigate any difficulties regarding her housing situation. While Mary's earnings are modest in today's economy, Gary's earnings are likewise modest, particularly without the beneficence of Emma. Additionally, he will have a significant child support obligation. While additional alimony could have been awarded on this record, we are unable to say that the trial court's award of alimony is untenable, and we will not disturb its award.

## VI. CONCLUSION

We affirm the court's order granting dissolution of the marriage and granting Mary custody of Allison. We modify the decree to order Gary to pay $68,324 of the property division judgment within 90 days of the entry of the district court's order and an additional $10,000 within 180 days of such time, with interest as provided above. We also modify the amount of child support so that it is $493 per month, effective July 1, 2004. In all other respects, the decree of dissolution is affirmed.

AFFIRMED AS MODIFIED.

*(See page 252 for appendix A.)*

**APPENDIX A**

BASIC NET INCOME AND SUPPORT CALCULATION

|  |  | MOTHER | COMBINED | FATHER |
|---|---|---|---|---|
| 1. | Total monthly income from all sources (except payments received for children of prior marriages and all means-tested public assistance benefits)* | 953.00 | | 2,564.00 |
| 2. | Deductions** | | | |
| | a.  Taxes*** | 0.00 | | 333.62 |
| | b.  FICA | 72.90 | | 196.15 |
| | c.  Health insurance**** | 0.00 | | 0.00 |
| | d.  Retirement | 0.00 | | 0.00 |
| | e.  Child support previously ordered for other children | 0.00 | | 0.00 |
| | f.  Regular support for other children | 0.00 | | 0.00 |
| | g.  Total deductions | 72.90 | | 529.77 |
| 3. | Monthly net income (line 1 minus line 2g) | 880.10 | | 2,034.23 |
| 4. | Combined monthly net income | | 2,194.33 | |
| 5. | Combined annual net income | | 34,971.93 | |
| 6. | Percent contribution of each parent (line 3, each parent, divided by line 4)***** | 30.2% | | 69.8% |
| 7. | Monthly support from table 1 | | 706.15 | |
| 8. | Each parent's monthly share (line 7, times line 6, for each parent) | 213.25 | | 492.90 |

*   Court will require copies of last 2 years' tax returns to verify "total income" figures and copies of present wage stubs to verify the pattern of present wage earnings, except where a party is claiming depreciation as a deduction from income, in which case a minimum of 5 years' tax returns shall be required. Income should be annualized and divided by 12 to arrive at monthly amounts.

**   All claimed deductions should be annualized and divided by 12 to arrive at monthly amounts

***   Deductions for taxes will be based on the annualized income and the number of exemptions provided by law.

****   The increased cost to the parent for health insurance for the child(ren) of the parent shall be allowed as a deduction from gross income. The parent requesting an adjustment for health insurance premiums must submit proof of the cost of the premium.

*****   In the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent contribution of each parent as shown in item 6. The calculation of the average income shall be attached to this worksheet.