IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

RICHTER V. RICHTER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KIMBERLY A. RICHTER, APPELLANT,

V.

JEFFREY R. RICHTER, APPELLEE.

Filed May 24, 2016.    No. A-15-533.

Appeal from the District Court for Scotts Bluff County: LEO DOBROVOLNY, Judge. Affirmed as modified.

Audrey M. Elliott, of Kovarik, Ellison & Mathis, P.C., for appellant.

Katy A. Anderson, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Kimberly A. Richter appeals from the order of the district court for Scotts Bluff County, which dissolved her marriage to Jeffrey R. Richter. Kimberly assigns error to the property and debt division, the award of income tax dependency exemptions for the parties' children, parenting time, attorney fees, and alimony. For the reasons that follow, we affirm as modified.

## II. BACKGROUND

### 1. PARTIES AND PRETRIAL PROCEEDINGS

The parties were married in July 1991. They have four children, Kalesha, born in 1993; Trenton, born in 1999; Jerrett, born in 2002; and Kambree, born in 2006. Kalesha turned 19 before

Kimberly filed the complaint in this case, and she was 20 years old at the time of trial. Trenton was 15, Jerrett was almost 13, and Kambree was 8 at the time of trial. Jerrett and Kambree have health issues involving immune deficiencies, which we discuss in greater detail below.

Jeffrey testified that the parties separated in October 2012, but according to Kimberly, the parties did not live in separate residences until the end of January or the first part of February 2013. On June 17, Kimberly filed a complaint for dissolution of marriage in the district court.

On August 14, 2013, the district court entered an award on temporary matters. The court awarded the parties temporary joint legal custody of their three minor children and gave Kimberly temporary primary physical custody subject to Jeffrey's parenting time. The court awarded Jeffrey temporary parenting time from 5 p.m. on Wednesday until 8 a.m. on Thursday subject to the parties' stipulations with respect to Kambree's modified schedule (the details of which do not appear in the record on appeal) and those occasions when the children were in Denver, Colorado for medical treatments. The court also granted Jeffrey temporary parenting time on alternating weekends from Friday at 5 p.m. to Sunday at 5 p.m. and a "Modified *Wilson v. Wilson* holiday schedule." The court ordered Jeffrey to pay temporary child support of $900 per month for three children, an upward deviation from the child support guidelines based on "the extraordinary medical expenses of two of the minor children." The court did not award temporary spousal support to either party.

Jeffrey filed an answer and counterclaim on October 8, 2014, seeking, among other things, an award of joint legal and physical custody, and an order allowing him to claim the parties' children for federal and state income tax purposes.

## 2. TRIAL

A dissolution trial was held before the district court on November 24 and December 16, 2014 and January 12, 2015.

### (a) Evidence Regarding Property and Debts

In September 2014, the parties were granted a discharge in a chapter 7 bankruptcy proceeding. The marital residence was repossessed prior to the bankruptcy.

During the marriage, the parties started Triple Play, a screen printing and embroidery business, with Kimberly's parents. Jeffrey testified that Kimberly did most of the work associated with this business during the marriage and that he helped as needed. According to Kimberly, her parents took over operation of the business and she and Jeffrey signed releases of liability, which "protected" Triple Play from the bankruptcy. The record includes a document signed by Kimberly, assigning her "undivided 25% membership interest" in Triple Play to her mother who also owned an "undivided 25% interest." At the time of trial, Jeffrey had not yet signed his interest over to either of Kimberly's parents, but he testified that he did not want any share or part of the business. Kimberly testified that Triple Play was not in operation at the time of trial. According to the bankruptcy discharge documents received in evidence, at the time of the liability releases, Triple Play owed more than the assets were worth and was generating little or no income.

The parties established a business together, JR Electric, in 2004. The original business structure is unclear from the record, but at some point the parties formed an LLC, which Jeffrey

testified was no longer "active." Prior to the parties' separation, Jeffrey performed the electrical work and did the billing, while Kimberly did some bookkeeping and "everything else." Some of the debts discharged in the parties' bankruptcy were debts owed by JR Electric to suppliers and since the bankruptcy, Jeffrey is no longer able to use these suppliers. Many of the tools Jeffrey used in this business were taken as a result of the bankruptcy, although Jeffrey was able to retain his hand tools.

Jeffrey testified that he was still operating as JR Electric, but that the bankruptcy had significantly affected the types of jobs on which he could afford to bid. Jeffrey could no longer afford to pay additional employees although he had paid his significant other for some work. He placed the current value of JR Electric at zero and testified that he wanted to dissolve the company. Kimberly testified that she did not want to continue as a partial owner of JR Electric. She testified that she did not have any idea as to the value of this business.

The parties had divided their personal property at the time of trial, with the exception of some guns and photographs in Kimberly's possession that were requested by Jeffrey.

The parties' only debts still outstanding at the time of trial were an IRS debt that could not be discharged in the bankruptcy and loans for a Chevrolet Suburban, in Kimberly's possession, and a Chevrolet Malibu, driven by Kalesha, that were "re-affirmed" in the bankruptcy. Kimberly asked to be awarded the Suburban and had maintained the payments on it since the parties' separation, though she was $250 behind on the scheduled payment of $616.31 at the time of trial. Jeffrey was willing sign both vehicles over to Kimberly.

The IRS debt arose out of an IRS audit of the parties' 2010 income tax return. It is unclear when the parties were first notified of the debt, but the debt statement entered into evidence has a "Notice date" of August 11, 2014. The debt statement shows an "Increase in tax" of $29,151, a "Decrease in credit" of $6,018, an "Increase in accuracy-related penalty on underpayments penalty" of $7,033.80, and an "Increase in interest" of $4,449.89, for a total amount due of $46,652.69. Jeffrey asked for the debt to be divided equally between the parties. Kimberly requested that any profits from JR Electric, at least up to the point when her interest was released, be used to "absorb" the IRS debt.

### (b) Evidence Regarding Parties' Backgrounds

At the time of trial, Kimberly was 40 years old. She resided in Scottsbluff, Nebraska with her boyfriend and the parties' minor children. Kimberly does not have any physical or mental disabilities that prevent her from working.

Kimberly has "about two years['] worth of college" education. She was employed at various jobs during the parties' marriage, and has not worked full-time since Jerrett's birth. Kimberly began working as a para educator at a kindergarten in 2013. Her W-2 form from this employment shows wages of $5,146.80, which Kimberly testified was a fair representation of her income in 2013. At some point in 2014, she switched positions and began working as a special education para in a high school earning $11.62 per hour. Her payroll summary for January 1 through November 21, 2014, which included amounts earned in 2014 for the kindergarten position and the subsequent high school position, showed gross pay of $11,347.24 and net pay of $8,494.92. She estimated her net monthly income at $945. Kimberly receives a Supplemental Security Income

payment for Jerrett's condition of $541 per month. She also receives certain reimbursements for mileage, food, and lodging related to travel for Jerrett's medical issues, although the reimbursements do not cover all of the expenses for these trips.

Kimberly testified that her monthly expenses were approximately $4,190. She requested an award of alimony based upon the length of the marriage and her financial need. She testified that she had incurred $6,102.13 in attorney fees so far and submitted a supporting affidavit.

Jeffrey was 40 years old and in good health. He resided in Scottsbluff, where he had lived with his significant other, Jill, and her three children (ages 10 to 14 years) since April 2014.

During the parties' marriage, Jeffrey consistently worked as an electrician and continued to do so after the parties' separation as reflected on their tax returns. He has a trade school degree in "[e]lectrical" and has a contractor's license as an electrician. Jeffrey anticipated his income at the time of trial would be comparable to what he earned in 2010, 2011, and 2012. His day-to-day work schedule at the time of trial varied, and his monthly income varies based on the time of year and electrical jobs he obtains. Excluding child support, Jeffrey's living expenses are about $1,670 per month. Jeffrey was two months behind on his child support at the time of the second day of trial. He did not believe his present earning capacity was more than $2,200 per month (a monthly net income of $2,247 was used to calculate Jeffrey's temporary support obligation). On the third day of trial, Jeffrey testified that his "take-home" for the previous couple of months had been approximately $2,000 or $2,500. Jeffrey testified that he had incurred $6,000 in attorney fees.

The parties' jointly filed individual income tax returns for 2010-2012 were admitted into evidence. For 2010, the parties reported business income for JR Electric of $16,567 and a loss of -$5,152 for Triple Play for total income of $11,415. For 2011, they reported business income of $14,224 for JR Electric, a loss of -$6,175 for Triple Play for total income of $8,049. And, for 2012, they reported a business loss of -$6,546 for JR Electric and a loss of -$5,439 for Triple Play for a total income of -$11,985. The parties had not completed tax returns for 2013, but Jeffrey billed out $26,156.07 in 2013. He disagreed that this amount represented his business income for the year as it did not take into account business expenses or whether clients had paid their bills.

(c) Evidence Regarding Children

There was evidence about Jerrett and Kambree's health issues. Both of these children have immune deficiency issues that require medical treatments in Denver every three weeks, and they take multiple medications. Kambree also has allergy issues, and Jerrett has "GI problems." Both children have dietary restrictions. Jerrett has undergone various surgical procedures and has a "central port" under his right shoulder blade to allow access for medical procedures and a "G-tube . . . button" in his stomach through which he receives medications. Kimberly has been primarily responsible for taking the children to Denver for their treatments and misses at least two days of work every three weeks due to this.

Melissa Bauer-Post, a licensed mental health practitioner, began providing counseling for the parties' minor children in June or July 2013. She testified that Kambree has an adjustment disorder with anxiety, which means she has "a lot of separation anxiety" and "fear of . . . losing her mother." According to Bauer-Post, when Kambree has consistent visitation with Jeffrey, she "gets increasingly more anxious" and requires more counseling than when she has less consistent

contact with him. Bauer-Post has suggested to Kimberly that Kambree may need anti-anxiety medication, something Bauer-Post does not frequently suggest for patients of Kambree's age. Because Kambree is "too scared to sleep by herself," she usually sleeps with Jerrett at Jeffrey's house. Jeffrey testified that he is working on this issue with Kambree with the goal of having her feel comfortable sleeping by herself in her own bedroom. Kimberly testified that Kambree had some issues with sleep at her house, that she had been sleeping by herself there, and that her sleep had "gotten worse with the anxiety over the last year, year and a half."

According to Bauer-Post, Jerrett has an adjustment disorder with anxiety and depression, and he has "difficulty with coping with the disappointment he feels when he spends time with his father," which leads to anger, irritability, and frustration that he takes out on other family members. Approximately three months prior to trial, Jerrett decided he did not want to spend as much time with his father.

Bauer-Post had last seen Trenton for counseling a couple of months prior to her testimony on the first day of trial though she did see him regularly when the children initially began counseling. She testified that Trenton does not have "a full-blown diagnosis with anxiety" but has "some anxiety feature" and was "showing some symptoms of depression," relating to Jeffrey "kind of not following through on things with him." There have been times when Trenton has not visited during a specific parenting time with Jeffrey, and he stopped attending visits with his father approximately a month prior to the first day of trial.

Bauer-Post has not been able to establish a good working relationship with Jeffrey. She had difficulty contacting him initially because "his voicemail was full." The first contact she had with him was around Christmas 2013. She invited Jeffrey to come in for a family therapy session with the children at that point, but he did not come in for another six months. Bauer-Post attempted family therapy sessions with Jeffrey and the children during the summer of 2014, but they were discontinued after approximately a month because Jeffrey did not feel they were beneficial. She contacted Jeffrey about a month prior to the first trial date to work on some issues with Jerrett, but he had not yet contacted her with respect to any appointments.

Bauer-Post testified that continued individual counseling was appropriate for both Kambree and Jerrett and while Jerrett was "getting better," Kambree was still "very, very anxious." Bauer-Post did not recommend switching counselors given the length of time she had worked with the children. She also recommended family therapy with Jeffrey at least for Jerrett because they needed to work on improving their relationship. She also made recommendations for Jeffrey including that he attend a parenting class and perhaps anger management classes. Bauer-Post testified that a "Circle of Security" parenting class would help Jeffrey and his significant other "see the types of things that Kambree would need to feel emotionally safe in his home."

Bauer-Post testified that while children whose parents are divorcing may experience anxiety, the level of anxiety she has seen in this case is unusual. Although the children have mentioned arguments and yelling in Jeffrey's home during their sessions with Bauer-Post, they have made no allegations of any kind of physical abuse. Bauer-Post recommended that Jeffrey only have therapeutic contact with the children until he had followed through on some of her recommendations. Kimberly agreed with this recommendation. Jeffrey did not agree, and he testified that if therapeutic visitation was ordered, he did not want it to be with Bauer-Post though

he was open to considering other counselors. Jeffrey did not feel that he would ever be able to have a relationship with the children as long as Bauer-Post was their counselor.

Trenton and Jerrett both testified at trial. Prior to their testimony, Kimberly's counsel requested that the court sequester the parties. Although the district court declined to grant this request, leaving the decision to remain in the courtroom up to each parent, Kimberly left the courtroom during Trenton and Jerrett's testimony. Jeffrey did not. When Jerrett took the stand, he asked if Jeffrey could leave because he did not "want any pressure." The court stated it could ask Jeffrey if he would step out of the courtroom but could not make him do so. Jeffrey declined because he wanted to hear what Jerrett had to say.

Trenton confirmed that he had not attended weekend parenting time with Jeffrey since August or September 2014 because he "didn't really feel comfortable over there, [he] guess[ed]." Trenton went on to testify that he did not feel as "safe" there as he did in the family home or in a location where Jeffrey lived previously because it "didn't really feel like home" and it was "really hard to adapt." He also testified that he and Jill's oldest and youngest child did not like each other very much. According to Trenton, he stopped seeing Bauer-Post for counseling because Kimberly told him he did not have to continue.

Trenton expressed reluctance to resume visiting Jeffrey because he was afraid it would be difficult to "adapt again" to the rules at Jeffrey's house, which were different than the rules at Kimberly's house. Trenton testified about things he considered "scary" at Jeffrey's residence, which included occasions when Kambree and Jerrett felt out of place and he had to help them and occasions when Jeffrey and Jill argued. He also expressed concerns because Jeffrey and Jill sometimes drank when they argued. Trenton testified that Jeffrey and Jill had never been in a "physical argument" in front of the children and that Jeffrey had never placed him in physical danger or hurt any of the children physically. Trenton testified that he felt safer at Kimberly's house because it felt more like home and that he would prefer to live with Kimberly. Trenton felt Jeffrey's relationship with Jill had placed a "wedge" in his relationship with Jeffrey and that he would like to have more one-on-one time with Jeffrey.

Jerrett also expressed concerns about Jeffrey and Jill's arguments and drinking. Jerrett testified that he feels unsafe at Jeffrey's house because Jeffrey and Jill drink, although Jeffrey has never hurt him physically and they mostly fight when the children are sleeping. He does get nervous when he goes to Jeffrey's house and made himself sick on one occasion. Jerrett felt that counseling with Bauer-Post was helpful. Jerrett testified that he got along with one of Jill's children, did not really talk to another, and had gotten into a physical altercation with the third for which they "got in trouble" and then "talked it out." He expressed some concern about Jeffrey not talking to him during visits and that Jeffrey might prefer to watch athletic events for one of Jill's children rather than ones in which Jerrett was participating. He testified that he would prefer to live primarily with Kimberly because he feels safer with her and she tends to his medical needs. Jerrett testified that he did not always get all of his medications at Jeffrey's house although he takes his medications back and forth with him.

Jerrett's testimony extended into the second day of trial, and he testified that Jeffrey "yell[ed at] and blam[ed]" him after the first day of trial and told him he "shouldn't say that if it's not the truth." It is not clear what prior testimony this statement was in reference to, and Jerrett

testified that he was truthful in all of his testimony. Jeffrey testified that Jerrett had lied in his testimony, although Jeffrey did not specify any particular portion of Jerrett's testimony as being "lies." Jeffrey and Jill both addressed testimony about Jeffrey's drinking habits, indicating that he might have from one to three beers when they were barbecuing or camping but that he never became intoxicated around his children.

Kimberly testified that she wanted custody of the children. She testified specifically that she wanted "legal custody" because she understood their medical needs and felt she could best support them emotionally and make sure they were "taken care of in the right [manner]." She felt that Jeffrey should be in the children's lives but that parenting time with him should be "on the kids' terms when they are willing to go over there." Jeffrey testified that he would like to have joint custody, but that if that were not possible, he would like parenting time every other weekend from Thursday through Sunday. He felt like the current schedule did not provide the children time to adapt and feel at home. He also requested a similar holiday schedule to that found in the temporary order and asked for a 2-week period of summer parenting time.

### 3. DECREE

On April 10, 2015, the district court entered a decree dissolving the parties' marriage. The court found both parties fit and proper persons to have joint legal custody of their minor children and awarded Kimberly primary physical custody. The court specifically found that the parties were not suitable parents to have joint physical custody "because they cannot co-parent." The court granted Jeffrey parenting time on alternating weekends from Thursday when the children were done with school activities (starting at 4 p.m. when the children were not in school) until Monday morning when the children enter school for the day (ending Sunday at 7 p.m. when the children were not in school). The court specified that Jeffrey should meet with Trenton one-on-one prior to the first weekend visit because they had not seen each other for several months prior to trial. The court stated, "Trenton appears to be the child most disturbed by his parents' separation, and Jeff[rey] must reassure him of the safety and stability of their relationship." The court specified when this one-on-one visit was to take place in the event the parties could not agree and also set forth a schedule for holiday parenting time. The court awarded Jeffrey parenting time on alternating Wednesdays from 4 p.m. to 8 p.m. The court did not award either party an extended period of summer parenting time.

The court ordered Jeffrey to pay child support of $1,169 per month for three children and to pay 68-percent of unreimbursed medical and dental expenses for the minor children in excess of $480 per child per year. The worksheet attached to the decree shows that support was calculated using gross income for Jeffrey of $4,000 and for Kimberly of $1,733. The court awarded Kimberly the tax dependency exemption for Kalesha, the parties' adult child, and awarded Jeffrey the exemptions for the parties' three minor children.

The district court found that the appropriate date to value the parties' marital property was the date of trial and that the net marital estate should be equitably divided between the parties; however, it did not specifically classify the parties' assets and debts as marital or nonmarital and value those classified as marital. The court found that unless otherwise specified, the parties should each pay his or her own debts to include his or her own medical bills and credit card debts, and

hold the other party harmless with respect to such debts. The court ordered Jeffrey to pay 68-percent and Kimberly to pay 32-percent of the approximately $46,000 IRS debt. The court ordered that each party should receive as his or her separate property his or her own clothing and personal effects; all personal property presently in his or her possession; all bank accounts, retirement accounts, investments, and insurance policies currently held in his or her name, respectively; and any other property currently in the party's possession. However, the court specifically awarded Jeffrey "his family's photographs, and the guns he testified about" and awarded Kimberly "the Chevrolet Suburban and the car being used by the parties' eldest daughter" and ordered Kimberly to "pay the indebtedness." The court found that Jeffrey should "receive all of the assets and be solely responsible for all of the liabilities of JR Electric" and that Kimberly should "receive all of the assets and be solely responsible for all of the liabilities of Triple Play."

Finally, the district court awarded Kimberly alimony of $50 per month beginning May 1, 2015 for 60 months, finding that Jeffrey had been the primary income source during the marriage and based on education and training had far greater income-producing ability. The court noted that Kimberly had been a stay-at-home parent for a significant portion of the marriage and had not significantly improved her education and training but that she was capable of earning greater than her current minimum wage income and the children were reaching an age where she could be employed full-time. The court concluded that alimony was appropriate but "not in a great amount" because Jeffrey would have child support to pay and had been assigned the greater share of the IRS debt. The court also noted that Kimberly was the representative payee of Supplemental Security Income payments for Jerrett in the amount of $541. The court also ordered Jeffrey to pay $3,000 toward Kimberly's attorney fees in payments of no less than $75 per month.

### 4. POST-TRIAL PROCEEDINGS

Kimberly filed a motion for new trial, or, to alter or amend the decree, alleging that the custody and parenting time awarded was not in the children's best interests. Among other things, she also challenged the decree with respect to the award of Triple Play and the division of the IRS debt. Jeffrey also filed a motion to alter or amend the judgment, asking the court to enter a finding with regard to his summer parenting time with the minor children and to make certain findings with respect to instances in which the children's medical appointments in Denver coincided with his Wednesday parenting time. On May 20, 2015, the district court entered an order denying both motions and finding no merit to any of the issues raised. With respect to Jeffrey's request for summer parenting time, the court stated:

> [T]he evidence at trial showed that [Jeffrey's] relationship with his children was strained - in Trenton's case, he had not seen his son for an extended period. The recommendations of [Bauer-Post] (which the court did not adopt) were for therapeutic visits only. The Court would consider summer parenting time after there is evidence of satisfactory weekend, weekday, and holiday visits.

Kimberly subsequently perfected her appeal to this court.

## III. ASSIGNMENTS OF ERROR

Kimberly asserts, restated, that the district court abused its discretion in (1) awarding her all of the assets and sole responsibility for all the liabilities of Triple Play, a business in which she no longer had an interest; (2) assigning her any part of the parties' IRS debt; (3) awarding her the tax dependency exemption for Kalesha, who is no longer a minor, and awarding Jeffrey the tax dependency exemptions for the parties' minor children, or alternatively, not requiring Jeffrey to be current on his child support obligation before claiming the children as tax dependency exemptions; (4) awarding parenting time to Jeffrey beyond that awarded in the temporary order or recommended by the children's therapist; (5) awarding her less than half of the attorney fees she incurred; and (6) awarding her alimony of only $50 per month for 60 months.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. DIVISION OF MARITAL ESTATE

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Brozek v. Brozek, supra.* Equitable property division is a three-step process. *Id.* The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.* The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id.* Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006).

With these principles in mind, we address Kimberly's first two assignments of error, which relate to the division of the marital estate.

### (a) Triple Play

Kimberly asserts that the district court abused its discretion in awarding her all of the assets and sole responsibility for all the liabilities of Triple Play, a business in which she no longer had an interest. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek, supra.* The record clearly shows that Jeffrey, Kimberly, and Kimberly's parents each owned a one-quarter interest in this business. Prior to trial the parties had signed over a loan associated with the business to Kimberly's parents, and Kimberly had assigned her one-quarter interest to her mother. Jeffrey had not yet released his one-quarter interest in the business, and while it is doubtful that his interest had any particular value, it was

part of the marital estate to be divided by the court. However, because the wording used by the court in awarding Jeffrey's interest in Triple Play to Kimberly was somewhat unclear, we modify the decree to state that Kimberly is awarded Jeffrey's one-quarter interest in Triple Play and shall receive any assets and be solely responsible for any liabilities associated with that one-quarter interest. Clearly, Kimberly is free to assign this interest to either of her parents subsequent to the transfer of Jeffrey's interest to her, something the court was not able to do directly as Kimberly's parents are not parties to the dissolution action. This assignment of error is without merit.

### (b) IRS Debt

Kimberly asserts that the district court abused its discretion in assigning her any part of the parties' IRS debt. The district court assigned 68-percent of this debt to Jeffrey and 32-percent to Kimberly; the same percentage contribution used by the court in calculating the parties' obligations with respect to child support.

A marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties. *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002). Kimberly essentially argues that this is not a marital debt because it was not incurred until after the parties' separation. We disagree. While the parties may not have been "billed" for the debt until after their separation and the filing of this action, it arose from an audit of their 2010 joint tax return and the resulting changes in the amount of tax owed by the parties for 2010 is properly classified as a marital debt. Income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus, income tax liability should generally be treated as a marital debt. *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001).

Kimberly further argues that Jeffrey hindered her efforts to work with the IRS to reduce the debt by denying her access to a business computer, resulting in "interest added to the debt, and arguably more debt assigned." Brief for appellant at 21. To the extent there is merit to this argument, Jeffrey is being required to pay nearly $16,800 more of the IRS debt than is Kimberly, which amount greatly exceeds the increase in interest of $4,449.89 noted on the debt statement from the IRS. Kimberly also argues she should not be responsible for any of the debt because it related primarily to the reporting of income from JR Electric, which business was awarded to Jeffrey, and she has not seen profits from or been associated with the business since 2012. We see this argument as another attempt at challenging the nature of the debt and as we explained above, the debt is clearly a marital debt, having been incurred during the marriage as a result of income earned in 2010.

Finally, we observe that while the district court did not engage in a traditional identification of marital property and valuation of the marital estate, the result was equitable under the circumstances of this case. The parties had very little left in the way of marital debt or property, other than the IRS debt, due to their bankruptcy. The IRS debt was a marital debt, and under the circumstances of this case, it was equitable to divide the debt in the proportionate manner set forth above. The court did not abuse its discretion with respect to the classification and division of the IRS debt.

2. ISSUES RELATING TO PARTIES' MINOR CHILDREN

(a) Tax Dependency Exemptions

Kimberly asserts that the district court abused its discretion in awarding her the tax dependency exemption for Kalesha, who is no longer a minor, and awarding Jeffrey the tax dependency exemptions for the parties' minor children, or alternatively, not requiring Jeffrey to be current on his child support obligation before claiming the children as tax dependency exemptions.

A tax dependency exemption is nearly identical in nature to an award of child support or alimony. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). The general rule is that a custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Id.* But, a court may exercise its equitable powers to allocate the exemption to a noncustodial parent. *Id.* An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *Id.* "The primary purpose for permitting a trial court to reallocate the exemption is to allow the party paying support to have more disposable income from which to make such payment." *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). "Accordingly, allocation of the dependency exemption to the noncustodial parent is not warranted if the parent pays a relatively small amount of child support." *Id.*

We agree that the district court abused its discretion in awarding Kimberly the tax dependency exemption for Kalesha, who was no longer a minor. Pursuant to Neb. Rev. Stat. § 42-351 (Reissue 2008), a district court has jurisdiction in divorce actions to render judgments and make orders concerning matters with respect to "the custody and support of minor children." Minors are unmarried persons under the age of 19. Neb. Rev. Stat. § 43-2101 (Cum. Supp. 2014). See *Henderson v. Henderson*, 264 Neb. 916, 653 N.W.2d 226 (2002) (finding abuse of discretion in child support and custody orders with respect to parties' adult child even though child was developmentally disabled); *Meyers v. Meyers*, 222 Neb. 370, 383 N.W.2d 784 (1986) (court cannot order continuing support for adult child as part of divorce decree). See, also, *Foster v. Foster*, 266 Neb. 32, 662 N.W.2d 191 (2003) (where terms of divorce decree, including allocation of dependency exemptions, were part of property settlement agreement, district court retained jurisdiction to enforce that agreement, even if dependency exemption award encompassed year during which child reached age of majority); and *Zetterman v. Zetterman*, 245 Neb. 255, 512 N.W.2d 622 (1994) (although Neb. Rev. Stat. § 42-364 (Cum. Supp. 2014) does not permit district court in dissolution action to order child support beyond age of majority, court has authority to enforce the terms of approved settlement which may include agreement to support child beyond the age of majority).

In this case, Kalesha had reached the age of majority prior to trial. Accordingly, the district court did not have the authority to enter a custody or support award with respect to Kalesha, although if she had still been a minor, it could have entered an order providing for her support beyond the age of majority. An obligor's duty to pay child support for a child terminates when the child reaches 19 years of age, the child marries, the child dies, or the child is emancipated by a court of competent jurisdiction, unless the court order for child support specifically extends child support after such circumstances. *Moore v. Bauer*, 11 Neb. App. 572, 657 N.W.2d 25 (2003)

(finding no error in district court's disregard of extraordinary expenses incurred by former wife in her support of child beyond majority age in determining child support obligation for remaining minor child); Neb. Rev. Stat. § 42-371.01 (Reissue 2008).

While the parties may be able to claim Kalesha as a dependent provided she is a student and has not reached the age of 24, see I.R.C. § 152(c)(3)(A)(ii) (2012), the record does not show that she was actually a student at the time of trial. Evidence from the first day of trial shows that she was apparently in college at some point, but that she took a medical leave from school and planned to return to college in January 2015. The record from the subsequent two days of trial does not establish whether this had occurred. And, while the parties could have reached an agreement with respect to any such dependency exemption for Kalesha and incorporated that agreement into the decree, they did not do so. Under the circumstances of this case, we conclude that the district court abused its discretion in awarding Kimberly the tax dependency exemption for Kalesha, who is more than 19 years of age, and we modify the decree to eliminate that award.

With respect to the tax dependency exemptions for the parties' three minor children, Jeffrey has been ordered to pay child support of $1,169 per month for these minor children. Although the court set Jeffrey's gross monthly income at $4,000 and his net monthly income at $3,287 (a determination that is not challenged on appeal), Jeffrey testified that his take-home income has been between $2,000 and $2,500. In either event, allocating the exemptions to Jeffrey will allow him to have more disposable income from which to make the child support payment. See *Anderson v. Anderson*, supra. We find no abuse of discretion in the court's award of the three exemptions to Jeffrey.

In the alternative, Kimberly argues that the district court should have at least required Jeffrey to be current on his child support obligation in order to claim the dependency exemptions for the parties' minor children. We agree. We therefore modify the decree to provide that Jeffrey's entitlement to the tax dependency exemptions is dependent upon his being current on his child support obligation as of December 31 of each year.

(b) Parenting Time

Kimberly asserts that the district court abused its discretion in awarding parenting time to Jeffrey beyond that awarded in the temporary order or recommended by the children's therapist.

The best interests of a child require "[a] parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." Neb. Rev. Stat. § 43-2923(1) (Cum. Supp. 2014). Factors to be considered by the court with respect to a child's best interests when determining parenting arrangements include:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

- 12 -

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

§ 43-2923(6). A reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Catlett v. Catlett*, 23 Neb. App. 136, 869 N.W.2d 368 (2015). There is not a certain mathematical amount of visitation that is considered reasonable; the determination of reasonableness is to be made on a case-by-case basis. *Id.*

Both Jerrett and Trenton expressed a desire to live with Kimberly and to have less parenting time with Jeffrey. The evidence shows that Trenton in particular has had a strained relationship with Jeffrey since the parties' separation. Both boys also testified to concerns related to drinking by and arguments between Jeffrey and Jill, although there was conflicting testimony on the issue of Jeffrey's drinking. Jerrett and Kambree have issues with anxiety in connection with visits to Jeffrey's house. There was some evidence that Jerrett does not always receive all of his medication at Jeffrey's house, but there was no evidence as to what, if any, harm he suffered as a result. Bauer-Post, the children's therapist, recommended therapeutic visitation only, as well as parenting and anger management classes for Jeffrey. The record does not reveal any physical abuse, but Bauer-Post testified that "the emotional abuse is pretty bad." Bauer-Post had only recommended therapeutic visitation in one other case, in a situation where the father suffered from mental illness and the children were in physical danger. Here, Kimberly testified that she did not think Jeffrey had "a mental health disorder" and she agreed that Jeffrey had not been diagnosed with a drug or alcohol problem. While the record was lacking in specific details about this emotional abuse and many of the concerns raised by Jerrett and Trenton also lack specificity, the record shows, at the very least, that the children have all had a difficult time adjusting to the circumstances of their parents' separation and Jeffrey's new relationship with Jill and her children. Jeffrey's accusations with respect to the veracity of Jerrett's testimony are also troubling when he could have chosen simply to present his own version of events rather than attacking Jerrett. However, the record shows that Jeffrey loves his children and that they do want to spend time with him.

In terms of the changes in parenting time between the temporary order and the decree, the temporary order provided for weekly parenting time from 5 p.m. Wednesday until 8 a.m. Thursday morning and alternating weekend parenting time from 5 p.m. Friday until 5 p.m. Sunday. In the decree, the district court significantly reduced Jeffrey's mid-week parenting time to alternating Wednesdays from 4 p.m. to 8 p.m. It expanded the alternating weekend time to begin Thursday afternoon and end Sunday evening or Monday morning with specific beginning and ending times dependent upon whether the children were in school. The court provided similar, though not identical, holiday parenting time schedules in both the temporary order and the decree. In the decree, the court specifically addressed some of the concerns raised at trial with respect to Jeffrey and Trenton's relationship and ordered that Jeffrey should meet with Trenton one-on-one prior to the first weekend visit. Finally, the court denied Jeffrey's request for an extended period of summer parenting time. In its order ruling on the parties' post-trial motions, the court again noted the strain in Jeffrey's relationship with his children and the recommendations made by Bauer-Post, and

determined that it would consider summer parenting time after evidence of satisfactory weekend, weekday, and holiday visits.

Jeffrey will need to work hard to rebuild a positive relationship with his children, and we would encourage him to pursue educational and therapeutic opportunities in that endeavor. However, upon our de novo review, we cannot say that the district court abused its discretion in declining to order therapeutic visitation or in the amount of parenting time awarded in the decree. The court considered issues raised by the evidence at trial and took certain steps to facilitate rebuilding the relationship between Jeffrey and his children, including ordering a special one-on-one visit with Trenton prior to the start of the weekend parenting time ordered in the decree, reducing the mid-week time, and declining to award extended summer parenting time. This assignment of error is without merit.

### 3. ATTORNEY FEES

Kimberly asserts that the district court abused its discretion in awarding her less than half of the attorney fees she incurred. An award of attorney fees involves consideration of such factors as the nature of the case, the services performed and results obtained, the length of time required for preparation and presentation of the case, the customary charges of the bar, and general equities of the case. *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013). Both parties had incurred attorney fees of at least $6,000 by the time of trial. The district court ordered Jeffrey to pay $3,000 toward Kimberly's attorney fees. This was a lengthy and contentious case, and while Jeffrey has a greater earning capacity than Kimberly, his business was negatively impacted by the parties' bankruptcy, he was ordered to pay a greater percentage of the parties' IRS debt (nearly $32,000), and he was ordered to pay $1,169 per month in child support. We find no abuse of discretion in the court's attorney fee award.

### 4. ALIMONY

Kimberly asserts that the district court erred in awarding her alimony of only $50 per month for 60 months.

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), courts should consider four factors relative to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). Beyond the specific criteria listed in § 42-365, in considering alimony upon the dissolution of marriage, a court should also consider the income and earning capacity of each party, as well as the general equities of the situation. *Id.* In reviewing an alimony award, an appellate court does not decide whether it would have awarded the same amount of alimony as the trial court. *Id.* Instead, it decides whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* The main purpose of alimony is to assist a former spouse for a period necessary for that individual to secure his or her own means of support. *Id.* In awarding alimony, reasonableness is the ultimate criterion. *Id.*

The parties were married in 1991 and separated in 2012 or 2013, so the marriage is one of long duration. As noted by the district court, Jeffrey was the parties' primary source of income,

and as a skilled electrician has a greater income-producing ability, although that has clearly been impacted by the parties' bankruptcy. Also, Jeffrey was ordered to pay the greater percentage of the parties' IRS debt. Kimberly was the primary caregiver for the parties' children and did not significantly improve her education or training during the marriage, although she had various jobs throughout the marriage. At the time of trial, she was employed part-time as a para educator earning $11.62 per hour. She does not have any mental or physical disability preventing her from working full-time, but the regular trips to Denver for Jerrett and Kambree's medical treatments do impose some limitations on her employability. The children are all of school age and Jerrett and Kambree do not require a great deal of specialized medical care at home other than medication management. Kimberly was current on her bills at the time of trial except for being $250 behind on the payments for the Suburban.

Clearly an award of alimony was appropriate in this case, however, as noted above, it is not this court's job to decide whether it would have awarded the same amount of alimony as the trial court. See *Binder v. Binder, supra*. Upon our de novo review, we find no abuse of discretion in the district court's alimony award to Kimberly of $50 per month for 60 months.

## VI. CONCLUSION

We affirm the decree entered by the district court except as modified to clarify the wording with respect to the award of Jeffrey's one-quarter interest in Triple Play to Kimberly, to eliminate the award to Kimberly of the income tax dependency exemption for Kalesha, and to provide that Jeffrey's entitlement to the tax dependency exemptions is dependent upon his being current on his child support obligation as of December 31 of each year.

AFFIRMED AS MODIFIED.